[No. D038611. Fourth Dist., Div. One. Feb. 5, 2002.]

GEMINI ALUMINUM CORPORATION, Plaintiff, Cross-defendant and Appellant, v.
CALIFORNIA CUSTOM SHAPES, INC., Defendant, Cross-complainant and Respondent.

COUNSEL

Law Offices of Peter L. Tripodes, Peter L. Tripodes; Heller & Edwards and Lawrence E. Heller for Plaintiff, Cross-defendant and Appellant.

Tyre, Kamins, Katz & Granof, H. Jay Ford III and John Valentine, Jr., for Defendant, Cross-complainant and Respondent.

OPINION

McCONNELL, J.—Plaintiff Gemini Aluminum Corporation (Gemini) appeals a judgment in favor of defendant California Custom Shapes, Inc. (CCS), entered after a jury rejected Gemini's claim that CCS intentionally interfered with its prospective economic advantage. Gemini contends the court erred by instructing the jury that it had the burden of showing CCS's wrongful conduct twice, first to establish a prima facie case and again to

defeat CCS's affirmative defense of the privilege of competition. Gemini also contends the court erred by defining "wrongful" for purposes of defeating the privilege as conduct constituting an independently actionable tort, the misappropriation of trade secrets. We conclude there was no prejudicial instructional error, and accordingly affirm the judgment.

Gemini also appeals a postjudgment order awarding CCS $160,200 in attorney fees under Civil Code[1] section 3426.4 for the "bad faith" prosecution of a claim for misappropriation of trade secrets. Gemini contends the award was improper because its case was not objectively "frivolous," a standard applicable to sanctions under Code of Civil Procedure section 128.5, and there was no evidence of its subjective bad faith. We find no abuse of discretion and affirm the order. We remand the matter to the trial court, however, for its determination of an award to CCS of attorney fees on appeal.

### FACTUAL AND PROCEDURAL BACKGROUND

Ray Williams, who was a principal of Taskmaster Industries Corporation (Taskmaster),[2] invented the "Taskmaster workbench." In the spring of 1995 Taskmaster and Makita entered into a contract under which Taskmaster would manufacture the workbenches under the Makita name and Makita would market them to the public. Taskmaster received purchase orders from Makita for 25,000 workbenches to be marketed at Sam's Club and other stores.

Gemini and CCS are both extruders and finishers of aluminum parts. Taskmaster hired Gemini to extrude and paint, or "powder coat," aluminum parts for the workbenches. Gemini subcontracted with CCS to perform the powder coating.

Gemini began shipping aluminum parts to Taskmaster in June 1995. In July or August 1995, CCS discovered defects in parts it had powder coated for Gemini. CCS and Gemini blamed the problem on each other's workmanship. The parties were unable to resolve the dispute, and by September 21, 1995, CCS ceased coating the Taskmaster parts, put Gemini on a credit hold and demanded a COD. payment for parts it had finished but not delivered to Gemini. However, in response to Gemini's threatened lawsuit, CCS delivered the materials to Gemini on a credit basis.

---

[1]Statutory references are to the Civil Code except when otherwise specified.

[2]Taskmaster is one of a number of related businesses of Williams, including TKM Manufacturing, Inc., and Workhorse Partners, Limited. For convenience, we refer to the entities collectively as Taskmaster.

Taskmaster experienced financial problems, and by mid-September 1995 was $326,219.21 in arrears to Gemini. Gemini had stopped shipping materials to Taskmaster the previous month. Unaware of these facts, on September 27, 1995, CCS's principal, Richard Price, instructed one of his salespersons, Larry Jackson, to "go get the [Taskmaster] business." Price believed that in addition to powder coating, CCS was capable of extruding the aluminum parts for the Taskmaster workbench. On the same date, Jackson sent Taskmaster a letter soliciting its account.

In late September 1995 CCS filed a small claims action against Gemini, seeking $4,600.28 for unpaid invoices. On November 9, 1995, four days before the scheduled trial date, Gemini sued CCS in municipal court for breach of contract and related counts. CCS cross-complained against Gemini for breach of contract and related counts. On November 30, 1995, CCS filed another small claims action against Gemini, seeking an additional $930.30 in damages.

In mid-November 1995 Gemini sued Taskmaster for $326,219.21 in unpaid invoices.

In January 1996 Taskmaster first ordered aluminum parts for the workbench from CCS. Between then and early June 1996 CCS billed Taskmaster $25,053.29 for materials it ordered. Taskmaster paid only $6,156.53 of that amount, and, by June 1996 CCS refused to perform additional work for it.

In September 1996 Taskmaster filed for bankruptcy protection under Chapter 7, and its $324,219.21 debt to Gemini was presumably discharged. In any event, Taskmaster never paid Gemini the arrearages.

In December 1996 Gemini sued CCS in superior court for misappropriation of trade secrets, unfair competition and conversion. Gemini alleged that CCS used the die drawings Gemini provided it, which drawings identify Taskmaster as its customer and are used to fabricate the aluminum parts for the workbench, to solicit Taskmaster's business. The parties stipulated to consolidate the various actions in superior court. In June 1998 Gemini filed a first amended complaint, adding a cause of action for interference with prospective economic advantage. In its answer, CCS raised the privilege of competition as an affirmative defense.

A jury trial began in August 1999. At the outset, Gemini decided to pursue only its causes of action for conversion and interference with prospective economic advantage. However, it stated that its misappropriation of trade secrets claim "would be encompassed within the interference claim[]."

At the close of Gemini's case-in-chief, CCS moved for nonsuit. The court granted the motion as to the conversion cause of action, but denied it as to the interference cause of action.

After several days of testimony, the jury deliberated less than one hour before unanimously finding that CCS did not intentionally interfere with Gemini's prospective economic relationship with Taskmaster. As an advisory matter, the jury also determined Gemini acted in bad faith in pursuing its claim for misappropriation of trade secrets. The jury awarded CCS $4,600 on its cross-complaint. Judgment was entered for CCS on the complaint and cross-complaint on September 17, 1999. Gemini unsuccessfully moved for a new trial.

CCS then moved for attorney fees under section 3426.4, arguing Gemini pursued its claim for misappropriation of trade secrets in bad faith. The court granted the motion based on the "history of this lawsuit," stating "the claim for misappropriation was a not uncommon kind of knee-jerk response" to CCS's small claims collection action, and finding a lack of evidence to support the claim. The court awarded CCS $160,200 after determining that a minimum of 90 percent of its attorney fees was related to the misappropriation claim.

DISCUSSION

I

*Jury Instructions*

A

Gemini contends the trial court improperly required it to prove CCS's wrongdoing twice, first to establish its prima facie case for interference with prospective economic advantage and second to defeat CCS's affirmative defense of the privilege of competition. The court instructed the jury that for purposes of the prima facie case, CCS's interference could range between "conduct which violates established business customs, standards, or ethics" and "misappropriation of the trade secret of another," but to defeat the privilege of competition CCS must have "used means that, considered by themselves, constituted a misappropriation of trade secrets."

" 'The tort of intentional . . . interference with prospective economic advantage imposes liability for improper methods of disrupting or

diverting the business relationship of another . . . . [Citation.]' [Citation.]" (*CrossTalk Productions, Inc. v. Jacobson* (1998) 65 Cal.App.4th 631, 646 [76 Cal.Rptr.2d 615].) The elements of the tort "have been stated as follows: '(1) an economic relationship between the plaintiff and some third party, with the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3) intentional acts on the part of the defendant designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic harm to the plaintiff proximately caused by the acts of the defendant.' [Citations.]" (*Westside Center Associates v. Safeway Stores 23, Inc.* (1996) 42 Cal.App.4th 507, 521-522 [49 Cal.Rptr.2d 793] (*Westside Center Associates*).)

■ "California law has long recognized a 'competition privilege' which protects one from liability for inducing a third person not to enter into a prospective contractual relation with a business competitor. The privilege applies where ' "(a) the relation [between the competitor and third person] concerns a matter involved in the competition between the actor and the competitor, and (b) the actor does not employ *improper means*, and (c) the actor does not intend thereby to create or continue an illegal restraint of competition, and (d) the actor's purpose is at least in part to advance his interest in his competition with the other." . . . .' [Citation.] In short, the competition privilege furthers free enterprise by protecting the right to compete *fairly* in the marketplace. One may compete for an advantageous economic relationship with a third party as long as one does not act improperly or illegally." (*Bed, Bath & Beyond of La Jolla, Inc. v. La Jolla Village Square Venture Partners* (1997) 52 Cal.App.4th 867, 880 [60 Cal.Rptr.2d 830] (*Bed, Bath & Beyond*), some italics added.)

In *Della Penna v. Toyota Motor Sales, U.S.A., Inc.* (1995) 11 Cal.4th 376 [45 Cal.Rptr.2d 436, 902 P.2d 740] (*Della Penna*), the Supreme Court disapproved of treating the defendant's justification, or privilege to interfere with *prospective* economic relations as an affirmative defense. ■ Rather, "[i]n light of the particular importance of free competition in the area of noncontractual business relations, it held instead that '. . . a plaintiff seeking to recover for an alleged interference with prospective contractual or economic relations must plead and prove as part of its case-in-chief that the defendant not only knowingly interfered with the plaintiff's expectancy, but engaged in conduct that was wrongful *by some legal measure other than the fact of interference itself.*' [Citation.]" (*Westside*

*Center Associates, supra,* 42 Cal.App.4th at p. 521, fn. 16, italics added, citing *Della Penna, supra,* 11 Cal.4th at p. 393.)[3]

As this court has explained, *"Della Penna*'s requirement that a plaintiff plead and prove such wrongful conduct . . . to recover for intentional interference with prospective economic advantage has resulted in a shift of burden of proof. It is now the plaintiff's burden to prove, as an element of the cause of action itself, that the defendant's conduct was independently wrongful and, therefore, was *not* privileged rather than the defendant's burden to prove, as an affirmative defense, that [its] conduct was *not* independently wrongful and therefore *was* privileged." *(Bed, Bath & Beyond, supra,* 52 Cal.App.4th at p. 881.)

We agree that under *Della Penna,* the court improperly shifted the burden regarding the privilege of competition between Gemini and CCS. Gemini had the burden of proving in its case-in-chief that CCS's conduct was independently wrongful and thus not protected by the privilege of competition. However, Gemini suffered no prejudice since the court's instructions ultimately required it to establish that CCS's conduct was not privileged. Instructional error in a civil case requires reversal " ' "where it seems probable" that the error "prejudicially affected the verdict." [Citations.]' [Citation.]" *(GAB Business Services, Inc. v. Lindsey & Newsom Claim Services, Inc.* (2000) 83 Cal.App.4th 409, 423 [99 Cal.Rptr.2d 665], citing *Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 580 [34 Cal.Rptr.2d 607, 882 P.2d 298].)

Although difficult to ascertain, the true crux of Gemini's instructional challenge appears to be that the court improperly required it to establish CCS's separate tort of misappropriation of trade secrets to defeat the competition privilege. Gemini suggests it was merely required to show CCS's violation of "industry standards." At trial, Gemini elicited testimony that it would be "unethical," "really bad business" or not "customary in the industry" for CCS to solicit the account of a company with which it was

---

[3]In *Della Penna,* the court quoted the following: " 'The problem with the prima facie tort approach is that basing liability on a mere showing that defendant intentionally interfered with plaintiff's prospective economic relations makes actionable all sorts of contemporary examples of otherwise legitimate persuasion . . . . The major issue in the controversy—justification for the defendant's conduct—is left to be resolved on the affirmative defense of privilege. In short, the prima facie approach to the tort of interference with prospective economic relations requires too little of the plaintiff.' [Citation.]" *(Della Penna, supra,* 11 Cal.4th at pp. 385-386, citing *Leigh Furniture and Carpet Co. v. Isom* (Utah 1982) 657 P.2d 293, 303.)

currently doing business, such as Gemini.[4] Gemini, however, cites no authority for its proposition. "Where a point is merely asserted by counsel without any argument of or authority for its proposition, it is deemed to be without foundation and requires no discussion." (*People v. Ham* (1970) 7 Cal.App.3d 768, 783 [86 Cal.Rptr. 906], disapproved of on another ground in *People v. Compton* (1971) 6 Cal.3d 55, 60, fn. 3 [98 Cal.Rptr. 217, 490 P.2d 537]; *People v. Sierra* (1995) 37 Cal.App.4th 1690, 1693 [44 Cal.Rptr.2d 575].) In any event, we find Gemini's position unpersuasive.

In *Della Penna,* the court declined to specify the scope of interference that would qualify as "wrongful." (*Della Penna, supra,* 11 Cal.4th at p. 393.) In a concurring opinion, Justice Mosk stated the tort of interference "requires objective, and unlawful, conduct or consequences" and "may be satisfied by intentional interference . . . *by independently tortious means*" or restraint of trade, including monopolization. (*Id.* at p. 408 (conc. opn. of Mosk, J.).) Justice Mosk eschewed the notion that wrongful interference could be measured by "the so called ' "business ethics" standard' [citation], which presupposes that '[t]he nature of the conduct which is acceptable today may . . . prove unacceptable tomorrow' [citation]." (*Id.* at p. 411 (conc. opn. Mosk, J.).)

In the absence of a definitive statement by the Supreme Court, "the meaning of 'wrongful conduct' is best derived from a review of earlier California cases that have applied a wrongfulness standard in assessing a defendant's alleged intentional interference with prospective economic relations." (*Arntz Contracting Co. v. St. Paul Fire & Marine Ins. Co.* (1996) 47 Cal.App.4th 464, 478 [54 Cal.Rptr.2d 888].) In *Tri-Growth Centre City, Ltd. v. Silldorf, Burdman, Duignan & Eisenberg* (1989) 216 Cal.App.3d 1139, 1153-1154 [265 Cal.Rptr. 330], this court explained the plaintiff must show the "defendant's interference is somehow wrongful—i.e., based on facts that take [its] actions out of the realm of legitimate business transactions." There, we held the court erred by granting the defendant law firm summary judgment when the evidence showed the firm breached its fiduciary duties to the plaintiff through the improper use of confidential information. (*Id.* at p. 1154.)

In *San Francisco Design Center Associates v. Portman Companies* (1995) 41 Cal.App.4th 29 [50 Cal.Rptr.2d 716] (*San Francisco Design Center*), on which the trial court here relied, the court held that to defeat the privilege of competition, the defendant's conduct "must be unlawful or illegitimate. That

---

[4]A principal disputed issue in the case was whether there was any business relationship between Gemini and CCS when CCS solicited Taskmaster's business.

is, . . . the . . . competitor's conduct [must have] violated a statute or constituted a tort such as fraud or unfair competition. The defendant's conduct must be independently actionable. [Citations.]" (*San Francisco Design Center, supra,* 41 Cal.App.4th at pp. 42-43, fns. omitted, citing *Conoco Inc. v. Inman Oil Co., Inc.* (8th Cir. 1985) 774 F.2d 895, 907 [" 'wrongful means' . . . refers to means which are intrinsically wrongful—that is, conduct which is itself capable of forming the basis for liability of the actor"]; *Doliner v. Brown* (1986) 21 Mass.App. 692 [489 N.E.2d 1036, 1039-1040].)

The court reasoned that "[r]equiring proof that the competitor's wrongful conduct is independently actionable will provide a clearer guide to competitors in the conduct of their business affairs. Detached from the concepts of actionable or unlawful, the term 'wrongful' provides little assistance in guiding future activities. . . . The term 'wrongful' is far too broad and covers much activity which should not defeat the competition privilege." (*San Francisco Design Center, supra,* 41 Cal.App.4th at p. 43.) In *Della Penna,* the court cited *San Francisco Design Center* favorably for the proposition that to defeat the privilege of competition the defendant's conduct must be " 'unlawful or illegitimate.' " (*Della Penna, supra,* 11 Cal.4th 376, 391.)

We conclude the nebulous "industry standards" test advanced by Gemini does not satisfy *Della Penna*'s requirement that the defendant's conduct "was wrongful by some *legal measure* other than the fact of interference itself." (*Della Penna, supra,* 11 Cal.4th at p. 393, italics added.) The court acknowledged in *Della Penna* that "[b]ecause ours is a culture firmly wedded to the social rewards of commercial contests, the law usually takes care to draw lines of legal liability in a way that maximizes areas of competition free of legal penalties." (*Id.* at p. 392.) The imposition of liability for interference based merely on opinions that the solicitation of a competitor's business was "unethical" or violated "industry standards" would create uncertainty and chill, not maximize, competition.

When the violation of "industry standards" is eliminated as a basis of liability, the only alleged "wrongful" interference of CCS was its misappropriation of Gemini's trade secrets. Accordingly, the trial court did not err by instructing the jury that Gemini had the burden of proving CCS committed the separate tort of misappropriation.[5]

---

[5]Given the facts here, we are not required to anticipate or determine whether there may be circumstances under which conduct not constituting an independently actionable tort may be

## B

Although the above discussion is dispositive, we note that had the trial court instructed the jury that Gemini could defeat the privilege by proving CCS's violation of "industry standards" or "unethical" conduct, the outcome would not have been more favorable to Gemini. As elements of its interference claim, Gemini was required to prove it had an economic relationship with Taskmaster with the probability of future economic benefit to it, and economic harm proximately caused by CCS's conduct. (*LiMandri v. Judkins* (1997) 52 Cal.App.4th 326, 339 [60 Cal.Rptr.2d 539]; BAJI No. 7.82.) Gemini did not meet its burden.

Williams and Hardy, Taskmaster's and Gemini's principals, respectively, had a critical meeting in late September 1995. Williams planned to give Hardy a $50,000 check in partial payment of the $326,219.21 that Taskmaster owed Gemini, but he either decided not to make the offer or Hardy rejected it. In any event, Williams abruptly left the meeting after deciding it was "time for a divorce" from Gemini.

Further, in the fall of 1995 Williams and his partner, Virgil Pettigrew, refused Gemini's request for personal guarantees or other agreement securing Taskmaster's payment of arrearages to Gemini. Hardy testified he would not have shipped any additional products to Taskmaster without payment or some type of security agreement, conditions that were never satisfied. Further, Gemini sued Taskmaster in November 1995 for nonpayment.

Williams testified that Taskmaster was "operating in the red . . . even from [its] first shipment" to Makita and it never generated any cash to pay the $326,219.21 it owed Gemini. Hardy confirmed that at the time of trial, Taskmaster had paid no portion of the $326,219.21 in arrearages. Williams denied that CCS's solicitation of Taskmaster's business caused its nonpayment to Gemini. Additionally, Taskmaster commenced a bankruptcy proceeding approximately three months before Gemini sued CCS in superior court for its solicitation of Taskmaster's business, and 21 months before Gemini amended its complaint to add a cause for interference with prospective economic advantage.

Gemini's expert, a certified public accountant, calculated its damages to be more than $1 million. However, he conceded his theory was based on the assumption that Taskmaster would fully pay Gemini and they would have a

---

deemed "wrongful" for purposes of imposing liability for the intentional interference with prospective economic advantage.

continuing economic relationship. He admitted that Taskmaster's bankruptcy filing "raises several questions" regarding the soundness of his assumption.

CCS did not solicit Taskmaster's business until shortly after Williams and Hardy's September 25, 1995 meeting and obtained no business from Taskmaster until January 1996. The jury could not reasonably have found that the solicitation caused the disruption of an economic relationship between Taskmaster and Gemini, with prospective economic benefit to Gemini, or any damages of Gemini attributable to CCS. To the contrary, Gemini's performance of additional work for Taskmaster would presumably have increased its damages since Taskmaster was insolvent.

## II

### *Attorney Fees Under Section 3426.4*

### A

Gemini challenges the propriety of the attorney fees award to CCS. The court relied on section 3426.4, a provision of the Uniform Trade Secrets Act (UTSA) (§ 3426 et seq.), which provides: "If a claim of misappropriation is made in bad faith, a motion to terminate an injunction is made or resisted in bad faith, or willful and malicious misappropriation exists, the court may award reasonable attorney's fees to the prevailing party."

The UTSA does not define "bad faith" as used in section 3426.4, and apparently there is no reported California case interpreting the term. In *Stilwell Development, Inc. v. Chen* (C.D.Cal. Apr. 25, 1989, No. CV86 4487 GHK) 1989 U.S. Dist. Lexis 5971 (*Stilwell*), a federal court noted the legislative history of section 3426.4 shows it is intended to " 'allow[] a court to award reasonable attorney fees to a prevailing party in specified circumstances as a *deterrent* to *specious* claims of misappropriation . . . .' [Citation.]" (*Stilwell, supra,* 1989 U.S. Dist. Lexis 5971 at p. *9, italics added.) The court concluded that "[a]s to deterrence, . . . it requires conduct more culpable than mere negligence. To be deterrable, conduct must be at least reckless or grossly negligent, if not intentional and willful. Webster's defines specious as, among other things, 'apparently right or proper: superficially fair, just, or correct but not so in reality . . . .' [Citation.] Thus, the claim must have been without substance in reality, if not frivolous." (*Ibid.*, citing Webster's 3d New Internat. Dict. (1986) p. 1287.)

The *Stilwell* court interpreted "bad faith" under section 3426.4 to require objective speciousness of the plaintiff's claim and its subjective misconduct

in bringing or maintaining a claim for misappropriation of trade secrets. (*Stilwell, supra,* 1989 U.S. Dist. Lexis 5971, accord, *Alamar Biosciences, Inc. v. Difco Laboratories, Inc.* (E.D.Cal. Feb. 23, 1996, No. CIV S 94 1856 DFL PAN) 1996 U.S. Dist. Lexis 18239 (*Alamar*); *VSL Corporation v. General Technologies, Inc.* (N.D.Cal. Jan. 5, 1998, No. C 96 20446 RMW(PVT)) 1998 U.S. Dist. Lexis 7377.) The court awarded attorney fees in *Stilwell,* finding that as to the objective component, the plaintiffs produced no evidence of confidentiality of the information or misappropriation. As to the subjective component, the court inferred from the complete failure of proof that the plaintiffs must have knowingly and intentionally prosecuted a specious claim. (*Stilwell, supra,* 1989 U.S. Dist. Lexis 5971.)

Gemini contends that in interpreting section 3426.4, we should apply the standard of Code of Civil Procedure section 128.5, subdivision (a), which provides: "Every trial court may order a party, the party's attorney or both to pay any reasonable expenses, including attorney's fees, incurred by another party as a result of bad-faith actions or tactics that are frivolous or solely intended to cause unnecessary delay." Whether an action is "frivolous" under Code of Civil Procedure section 128.5 "is governed by an objective standard: Any reasonable attorney would agree it is totally and completely without merit. [Citation.] But there must also be a showing of an improper purpose, i.e., *subjective* bad faith on the part of the attorney or party to be sanctioned. [Citation.]" (*In re Marriage of Reese & Guy* (1999) 73 Cal.App.4th 1214, 1220-1221 [87 Cal.Rptr.2d 339].)

Unlike Code of Civil Procedure section 128.5, subdivision (a), however, section 3426.4 does not contain the word "frivolous." Moreover, in enacting section 3426.4 the Legislature was concerned with curbing "specious" actions for misappropriation of trade secrets, and such actions may superficially appear to have merit. We find *Stilwell* persuasive and conclude that "bad faith" for purposes of section 3426.4 requires objective speciousness of the plaintiff's claim, as opposed to frivolousness, and its subjective bad faith in bringing or maintaining the claim.

An award of attorney fees for bad faith constitutes a sanction (*Computer Prepared Accounts, Inc. v. Katz,* (1991) 235 Cal.App.3d 428, 431 [286 Cal.Rptr. 556]), and the trial court has broad discretion in ruling on sanctions motions. (*Tenderloin Housing Clinic, Inc. v. Sparks* (1992) 8 Cal.App.4th 299, 304 [10 Cal.Rptr.2d 371].) "Assuming some evidence exists in support of the factual findings, the trial court's exercise of discretion will not be disturbed unless it exceeds the bounds of reason. [Citation.] [¶] In reviewing the facts which led the trial court to impose sanctions, we must accept the

version thereof which supports the trial court's determination, and must indulge in the inferences which favor its findings. [Citations.]" (*West Coast Development v. Reed* (1992) 2 Cal.App.4th 693, 698 [3 Cal.Rptr.2d 790].)

 We cannot say the court abused its discretion. The UTSA defines a trade secret as information that "(1) *Derives independent economic value, actual or potential,* from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and [¶] (2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." (§ 3426.1, subd. (d), italics added.) When information has no independent economic value, a claim for misappropriation lacks merit. (*GAB Business Services, Inc. v. Lindsey & Newsom Claim Services, Inc., supra,* 83 Cal.App.4th, at p. 429 [confidential salary information not a trade secret because it had no independent economic value].)

Gemini alleged that CCS misappropriated the identity of Taskmaster and die drawings needed for the extrusion of aluminum parts for the workbench. Customer lists and related information may constitute protectable trade secrets. (See, e.g., *Morlife, Inc. v. Perry* (1997) 56 Cal.App.4th 1514, 1521 [66 Cal.Rptr.2d 731]; *ABBA Rubber Co v. Seaquist* (1991) 235 Cal.App.3d 1, 19 [286 Cal.Rptr. 518].) However, Gemini filed its complaint for misappropriation and related counts in December 1996, long after the identity of Taskmaster and die drawings for the workbench parts arguably held any economic value, actual or potential, to Gemini, CCS or any other competitor. By September 1995 Taskmaster was $326,219.21 in arrears to Gemini, and by the summer of 1996 it was $18,896.76 in arrears to CCS. Further, in September 1996 Taskmaster filed a bankruptcy proceeding. Gemini's case was objectively specious, if not frivolous, from its inception.

The timing of Gemini's action also raises an inference of subjective bad faith. "*Good faith,* or its absence, involves a factual inquiry into the plaintiff's subjective state of mind [citations]: Did he or she believe the action was valid? What was his or her intent or purpose in pursuing it? A subjective state of mind will rarely be susceptible of direct proof; usually the trial court will be required to infer it from circumstantial evidence." (*Knight v. City of Capitola* (1992) 4 Cal.App.4th 918, 932 [6 Cal.Rptr.2d 874].) " '[B]ad faith' means simply that the action or tactic is being pursued for an improper motive. Thus, if the court determines that a party had acted with the intention of causing unnecessary delay, or for the sole purpose of harassing the opposing side, the improper motive has been found, and the court's inquiry need go no further." (*Summers v. City of Cathedral City* (1990) 225 Cal.App.3d 1047, 1072 [275 Cal.Rptr. 594].)

██ The legal requirement of economic value in a misappropriation case is well established and straightforward, and, by December 1996, Gemini could not have reasonably believed that Taskmaster's identity and die drawings retained any economic value. Moreover, before trial CCS brought the infirmities in Gemini's misappropriation claim to its attention, but its counsel "stat[ed] curtly that he did not want to reveal his theories of liability or the evidence supporting those theories," and "CCS [did not] have a clue about this case and [he had] no desire to educate [it]." "Bad faith may be inferred where the specific shortcomings of the case are identified by opposing counsel, and the decision is made to go forward despite the inability to respond to the arguments raised." (*Alamar, supra,* 1996 U.S. Dist. Lexis 18239, p. *3.)

Despite the lack of any proof of economic value, Gemini persisted with its misappropriation claim through trial, in conjunction with its cause of action for intentional interference with prospective economic advantage. Gemini, in fact, requested a jury instruction that the interference may consist of misappropriation. Yet, at the hearing on the motion for attorney fees, Gemini's counsel argued "[w]e did not attempt to prove that it was a trade secret," presumably conceding the lack of merit. Further, during his testimony Hardy revealed his hostility toward CCS and its principal, Price. Hardy referred to CCS as "snaky"; to. Price twice as a "snake"; to Price and Williams, Taskmaster's principal, as "two snakes in a paper sack"; and to Williams as having "had a snake [Price] hid[den]." Under all the circumstances, we cannot fault the court for finding both objective speciousness and subjective bad faith and awarding CCS attorney fees under section 3426.4.[6]

## B

CCS seeks attorney fees on appeal. ██ " '[I]t is established that fees, if recoverable at all—pursuant either to statute or [the] parties' agreement—are available for services at trial *and on appeal.*' " (*Morcos v. Board of Retirement* (1990) 51 Cal.3d 924, 927 [275 Cal.Rptr. 187, 800 P.2d 543]; *Serrano v. Unruh* (1982) 32 Cal.3d 621, 637 [186 Cal.Rptr. 754, 652 P.2d 985].) CCS is the prevailing party on appeal, and thus it is entitled to fees under section 3426.4. "Although this court has the power to fix attorney fees on appeal, the better practice is to have the trial court determine such fees." (*Security*

---

[6]Gemini unpersuasively contends its lack of bad faith is demonstrated by the court's denial of CCS's motion for nonsuit on its cause of action for intentional interference with prospective economic advantage, which was based on the misappropriation of trade secrets, and motion for a directed verdict on that claim. In our view, the motion for nonsuit should have been granted on the entire case, as opposed to only the conversion cause of action, because it was devoid of merit.

*Pacific National Bank v. Adamo* (1983) 142 Cal.App.3d 492, 498 [191 Cal.Rptr. 134].)

### DISPOSITION

The judgment and order are affirmed. The matter is remanded to the trial court for its determination of an award to CCS for attorney fees on appeal. CCS is also awarded costs on appeal.

Nares, Acting P. J., and Haller, J., concurred.

Appellant's petition for review by the Supreme Court was denied May 22, 2002. George, C. J., and Baxter, J., did not participate therein.