Filed 12/5/14  Luna v. Garza CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

|  |  |
|---|---|
| TOMMY STEVEN LUNA as Trustee, etc., | E055099 |
| Plaintiff and Respondent, | (Super.Ct.No. RIP095869) |
| v. |  |
| LISA MARIE GARZA, |  |
| Defendant and Appellant. |  |
| TOMMY STEVEN LUNA as Trustee, etc., | E055722 |
| Plaintiff and Appellant, | (Super.Ct.No. RIP095869) |
| v. | OPINION |
| LISA MARIE GARZA, |  |
| Defendant and Respondent. |  |

APPEAL from the Superior Court of Riverside County.  Craig Riemer, Judge.

Affirmed.

1

Best Best & Krieger, William R. DeWolfe, Kira L. Klattchko and Irene S. Zurko for Defendant, Appellant and Respondent.

Bradley R. Kirk & Associates and Bradley R. Kirk for Plaintiff, Respondent and Appellant.

Tommy Stephen Luna (Tommy),[1] successor trustee of the Beatrice Luna Living Trust dated October 24, 2006 (the trust), petitioned the probate court for (1) a declaration reflecting a house on Lake Shore Drive in Lake Elsinore (the house) is property of the trust; and (2) Tommy's sister, Lisa Garza (Lisa), acted in bad faith by having their mother, Beatrice Luna (Mother), transfer the house from the trust to Lisa. The probate court granted Tommy's petition. Specifically, the probate court (1) declared the house is trust property; (2) ordered Lisa to execute a quitclaim deed conveying the house to the trust; (3) found Lisa acted in bad faith when she had Mother take the house out of the trust; and (4) ordered Lisa to pay damages in the amount of $180,000 for the bad faith wrongful taking of trust property (Prob. Code, § 859).[2] Additionally, the probate court denied Tommy's motion for sanctions. (Code Civ. Proc., § 128.7.)

Lisa has appealed and Tommy has cross-appealed. In Lisa's appeal, she contends (1) substantial evidence does not support the finding she acted in bad faith

---

[1] People involved in this matter share the same last name. Therefore, we use first names for the sake of clarity. No disrespect is intended.

[2] All subsequent statutory references will be to the Probate Code unless otherwise indicated.

2

(§ 859); and (2) Tommy's petition should be barred by the doctrine of unclean hands. In Tommy's cross-appeal, he contends the probate court erred by denying his motion for sanctions (Code Civ. Proc., § 128.7). We affirm the judgment on the appeal and cross-appeal.

## FACTUAL AND PROCEDURAL HISTORY

### A.    BACKGROUND

The house is a three bedroom, two bathroom home in Lake Elsinore. Mother was married to John Luna (Father). Mother and Father had two biological sons. The elder son died at a young age. The younger son, Johnny Jr., suffered from cerebral palsy and was unable to care for himself. Mother and Father adopted Tommy and Lisa. Lisa was adopted around 1971 at the age of seven; Tommy was adopted before Lisa.

### B.    2006

Father died in early October 2006, at the age of 91. "[R]ight after" Father died, Tommy took Mother to create a trust. However, at that appointment, Mother refused to sign the trust documents. On October 24, 2006, Mother signed the trust documents. The trust provides that Tommy would receive 95 percent of the trust assets, while Lisa would receive 5 percent of the trust assets. The trust reflects Mother was the trustee, Tommy was the first successor trustee, and Ray Corral was the second successor trustee. Ray and Jeanie Corral were Mother and Father's next door neighbors for 35 years. Also on October 24, 2006, Mother executed a quitclaim deed placing the house in the trust. The house was the sole asset of any significant value in the trust. The house had a value of $90,000.

3

C.    2008

In 2008, Mother was "in her 80s." Johnny Jr. died in July 2008. Tommy lived with Mother in the house. Lisa resided in an apartment, with her husband and children. Lisa visited Mother approximately three times per week and spoke on the telephone with Mother on a daily basis. In May 2008, Lisa noticed Mother had a black eye. In August 2008, Lisa saw Mother again suffered a black eye. In September 2008, Mother had bruises on both sides of her torso.

On September 7, 2008, Mother said Tommy caused the torso bruises by striking her. Lisa was concerned for Mother and asked Jeanie Corral (Jeanie) to visit Mother. Jeanie visited Mother in early September and saw the bruises on the sides of Mother's torso. Mother told Jeanie, "'He hit me.'" Jeanie contacted the Riverside County Sheriff's Department and reported the alleged abuse. On or about September 12, Sheriff's deputies met Jeanie at the house and arrested Tommy. Mother was taken from the house, via ambulance, to a hospital.

Lisa met Mother at the hospital. On September 12, while at the hospital, Lisa spoke with Melinda Zingg (Zingg). Zingg was a social worker for Riverside County Adult Protective Services. Zingg spent approximately 45 minutes to one hour with Mother. Mother did not recognize Lisa, and identified Lisa as her sister. Mother appeared confused and seemed to have memory impairments.

Lisa believed Zingg felt that Lisa had failed to protect Mother. Zingg explained to Lisa the possibility that Mother would be made a ward of the state, and that if Mother became a ward then Mother's family would not be able to visit Mother. Zingg agreed to

4

let Mother reside with Lisa on the condition that Lisa immediately petition the court for a conservatorship for Mother. Lisa explained to Zingg that Mother was capable of making decisions and caring for herself, but nevertheless agreed to seek a conservatorship so that Mother could live with Lisa.

Upon leaving the hospital, Mother moved into Lisa's apartment. On September 13, Lisa took Mother to the bank to close Mother's bank accounts and open new accounts. While at the bank, Mother told the manager "the whole story of what had happened." On September 16, Lisa took Mother to a lawyer's office. The lawyer interviewed Mother. It appeared to the lawyer's paralegal that Mother understood the lawyer's questions and had no difficulty responding. The lawyer agreed to represent Mother, but needed time to prepare the necessary documents.

The following day, on September 17, in the morning, Lisa again took Mother to the lawyer's office. The law firm prepared an application for a restraining order (against Tommy) and declaration for Mother. Mother handwrote her address on the declaration and Mother signed her first name on the signature line. However, Mother did not sign her last name on the signature line. Mother explained the lack of last name by saying "she couldn't write." The law firm filed the application for a restraining order.

Also on September 17, "towards the afternoon," after the meeting at the lawyer's office, Zingg met with Mother at Lisa's apartment for 15 to 20 minutes. Lisa had to tell Mother who Zingg was because Mother did not recall meeting Zingg at the hospital five days prior. During the meeting, Mother could not say what room she was in, could not

identify a pen, could not recall the date, could not recall who the president was, and could not recall her date of birth. Zingg spoke to Lisa. Lisa said she believed Mother had the capacity to sign legal documents. Zingg disagreed. Zingg told Lisa that Mother should not sign any legal documents until a formal capacity assessment was conducted.

After church, on September 28, Mother, Lisa, and Lisa's husband had lunch. After lunch, they were in the living room and Mother thanked Lisa and her husband for all their assistance. Mother then said that, after her death, she wanted Lisa and her husband to live in the house. Lisa told Mother there was no need to worry about such things. Mother again told Lisa she wanted Lisa to have the house. Lisa's husband was the only other person present during the conversation.

The following day, September 29, Lisa contacted the same lawyer's office that had assisted with the restraining order. The paralegal at the law firm explained that a quitclaim deed and property description would be needed to transfer the house to Lisa. On September 30, in the morning, Lisa took Mother to the lawyer's office. Mother told the paralegal she wanted to give the house to Lisa. The paralegal believed Mother understood the quitclaim deed and thought Mother did not appear confused. Mother executed the quitclaim deed conveying the house from the trust to Lisa. The paralegal wrote the date and printed Mother's name on the deed, so Mother only needed to sign the document. The quitclaim deed was recorded on October 1, 2008.

Mother's capacity assessment was scheduled for the afternoon of September 30. Since Mother and Lisa had been at the lawyer's office in Lake Elsinore in the morning, and the assessment was scheduled for the afternoon in Moreno Valley, Mother was

6

unable to take a nap prior to the assessment. Mother typically took a nap after eating lunch.

Zingg met with Mother at the hospital both before and after the formal capacity assessment. On that day, Zingg again advised Lisa to petition the court for a conservatorship for Mother, due to Mother's capacity and memory impairment issues. In the three visits Zingg had with Mother, Mother never appeared lucid. Lisa believed Mother appeared tired but coherent on September 30th.

Dr. Jafri evaluated Mother on September 30th. The evaluation lasted approximately three hours. The assessment reflected Mother suffered from visual impairment, in that she had "bilateral cataracts," and Mother suffered from hearing impairment. To evaluate mental impairment, a Folstein mini-mental examination was administered. There are 30 questions on the exam. A score of 25 to 30 indicates the person is "functioning with capacity." Scores of 20 to 25 reflect "[m]ild impairment." A score below 17 generally "indicates severe impairment." A score from nine to zero would be "very advanced" incapacity. On September 30, Mother scored a seven on the Folstein mini-mental examination.

A Hopkins Competency Assessment Test (HCAT) was also administered to Mother. The HCAT assesses decision making capability based upon how well the patient understands directions and responds to directions. A score of 10 means the patient is functioning at the "expected level," while a score of zero means the person is not responding to the questions. Mother scored "1 out of 10." Thus, the HCAT result confirmed the Folstein result that Mother "was severely incapacitated."

During the interview portion of the assessment, Mother was not oriented as to time, place, or situation. Mother displayed short-term and long-term memory deficits. Mother could not follow most instructions. Mother was either "[b]arely" able to answer questions or not able to answer questions. The doctor found Mother suffered major impairments as to time, place, attention, concentration, verbal communication, and short-term memory.

Based upon an interview with Lisa, the doctor concluded Mother's impairments "vary on a daily basis. Better some days and worse some days." The doctor explained that if a patient with severe dementia has "varying" impairments, the variations on a Folstein scale would typically be from a zero to a three. A person would not vary from severe dementia to mild dementia. The doctor opined it would be "[m]edically highly improbable" for a person to vary from a seven on the Folstein scale to "normal within a couple hours."

On October 15, Lisa took Mother to the same attorney's office in order for Mother to give Lisa her power of attorney for healthcare and financial matters. Lisa explained "power of attorney" to Mother. Lisa believed Mother understood the explanation because Lisa "knew" Mother and "could tell she understood." Mother executed the power of attorney documents. The paralegal spoke to Mother during the meeting. The paralegal had no difficulty understanding Mother during the meeting. The paralegal did not think Mother was confused, and Mother's behavior did not appear unusual to the paralegal.

On November 4, Lisa filed a petition to appoint a conservator for Mother. On the petition, Lisa explained Mother had been "'diagnosed with dementia.'" Lisa explained Mother was "'unable to communicate and make medical and personal decisions on her own. She cannot clothe or bathe herself.'" In court, Lisa explained Mother "wasn't like that all the time. She started to be, but it wasn't severe. She didn't really get like that until probably mid-January or so." Lisa said she filed the conservatorship petition because Zingg made it a condition to Mother living with Lisa.

D.    2009 AND 2010

According to Lisa, Mother's mental capacities failed significantly in late May 2009 or June 2009. Mother died on July 23, 2009. Mother resided with Lisa until Mother's death. Tommy was not involved with Mother "at all" after his arrest. Upon Mother's death, Tommy became the successor trustee of the trust. In 2010, Tommy pled guilty to inflicting unjustifiable physical pain or mental suffering upon Mother. (Pen. Code, § 368, subd. (c).)

E.    LEGAL PROCEEDINGS

On December 2, 2009, Tommy petitioned the probate court for (1) a declaration reflecting the house "is vested [in] Tommy Stephen Luna, Successor Trustee" of the trust; and (2) Lisa acted in bad faith by having Mother transfer the house from the trust to Lisa (§ 859).

The front page of the petition reads, "Petitioner Tommy Stephen Luna hereby presents his Petition for Declaratory Relief." The petition further reflects, "PETITIONER, as an interested person and as a successor Trustee of the Trust, requests

9

the Court to make an order that the successor trustee of the Trust has a claim to the [house] that is currently titled in the name of LISA GARZA." The petition also reflects, "Petitioner believes that he has the necessary standing as a successor Trustee and an interested person to file this Petition." In the petition, Tommy identified himself as a beneficiary, heir, son, interested person, and successor trustee.

Lisa responded to and objected to Tommy's petition. Lisa denied the allegations that the house belonged to the trust and that she acted in bad faith. Lisa asserted Tommy's petition was barred by the doctrine of unclean hands.

After a seven day bench trial, the probate court issued a written statement of decision. The probate court found it was undisputed that the 2006 trust was a valid and binding document. The court found Tommy was the successor trustee, the house was valued at $90,000, and the house was the only asset of significant value in the trust. In regard to Mother's capacity, the court found Tommy's evidence, e.g., the medical testimony, "was more objective, more qualified, and more credible" than Lisa's evidence. As a result, the court found that, at the time Mother executed the 2008 deed, Mother lacked the mental capacity to do so.

As to bad faith, the court found that in 2008, when Lisa caused the deed to be prepared, took Mother to execute the deed, and accepted the deed, "(a) Lisa should have known, and did subjectively know, that [Mother] lacked the capacity to convey the [house], and (b) Lisa's actions were motivated, not by an honest mistake of fact, but by her desire either to gain an unearned financial advantage, to deprive Tommy of any benefits under the Trust, or both." As a result of the bad faith finding, the probate court

10

concluded Lisa was liable for twice the value of the house, i.e., $180,000. (§ 859 [twice the value of the property recovered].)

In regard to unclean hands, the probate court found Tommy failed to expressly allege in what capacity he brought the petition, e.g., as a beneficiary or as trustee. The probate court concluded that Tommy was not entitled to any relief under the petition as an individual. Therefore, the relief provided would be in Tommy's capacity as trustee. Since the petition was an action on behalf of the trust, the court found the doctrine of unclean hands did not apply, i.e., the trust's hands were clean.

The court granted Tommy's petition, in Tommy's capacity as trustee. The court (1) declared the house belonged to the trust, (2) ordered Lisa to execute a quitclaim deed conveying the house to Tommy as trustee, and (3) awarded damages against Lisa in the amount of $180,000.

## DISCUSSION

A.      BAD FAITH

Lisa contends substantial evidence does not support the trial court's finding of bad faith.

1.      *MEANING OF "BAD FAITH"*

As a preliminary matter, we must determine the meaning of the term "bad faith." "When interpreting a statute, ""'[w]ords must be construed in context, and statutes must be harmonized, both internally and with each other to the extent possible.' [Citation.] Interpretations that lead to absurd results or render words surplusage are to be

11

avoided."' [Citations.]" (*Regents of University of California v. Superior Court* (2013) 220 Cal.App.4th 549, 566-567.)

Section 859 provides, "If a court finds that a person has in bad faith wrongfully taken, concealed, or disposed of property belonging to a Conservatee, a minor, an elder, a dependent adult, a trust, or the estate of a decedent, or has taken, concealed, or disposed of the property by the use of undue influence in bad faith or through the commission of elder or dependent adult financial abuse . . . the person shall be liable for twice the value of the property recovered by an action under this part." This "double damages" provision is "punitive in nature." (*In re Estate of Young* (2008) 160 Cal.App.4th 62, 88.)

"Bad faith" is not defined in section 859 or elsewhere in the Probate Code (§ 20 et seq.). In an analogous punitive statute "bad faith" is understood to pertain, at least in part, to one's subjective motives and whether the conduct complained of was engaged in for an improper motive. (See, e.g., *Gemini Aluminum Corp. v. California Custom Shapes, Inc.* (2002) 95 Cal.App.4th 1249, 1263 ["""[B]ad faith" means simply that the action or tactic is being pursued for an improper motive.'" Discussing Civil Code section 3426.4's authorization for recovery of attorney's fees].)

However, that same "improper motive" definition may not apply in the Probate Code. Section 259, subdivision (a), provides that any person who physically or financially abuses an elder in "bad faith" *and* who was "reckless, oppressive, fraudulent,

12

or malicious" in his or her actions will be deemed to have predeceased the elder.[3]  Thus, it would appear that, in terms of the Probate Code, "bad faith" is separate from intent because section 259 treats "bad faith" as a separate element from recklessness and malice.

As a result, we look to a different legal definition of bad faith.  The term "bad faith" has also been used to describe situations wherein a defendant's belief was wholly unreasonable.  "'For example, the circumstances in a particular case might indicate that although defendant may have "believed" he acted lawfully, he was aware of contrary facts which rendered such a belief wholly unreasonable, and hence in bad faith.'" (*People v. Vineberg* (1981) 125 Cal.App.3d 127, 137.)

Interpreting "bad faith" to relate to the concept of a mistaken belief would keep the term relevant for purposes of section 259, in that it would not be rendered redundant by the "reckless" and "malicious" portion of the statute.  Section 259 and section 859 both address people who have, in "bad faith," financially abused an elder.  Therefore, logic dictates that the term "bad faith" should have the same meaning in both statutes. As a result, we interpret "bad faith" in section 859 as relating to the alleged abuser's beliefs, i.e., whether the alleged abuser's belief was wholly unreasonable, and hence in

---

[3]  Section 259, subdivision (a), provides, in relevant part:  "Any person shall be deemed to have predeceased a decedent to the extent provided in subdivision (c) where all of the following apply:  [¶]  (1) It has been proven by clear and convincing evidence that the person is liable for physical abuse, neglect, or financial abuse of the decedent, who was an elder or dependent adult.  [¶]  (2) The person is found to have acted in *bad faith*.  [¶]  (3)  The person has been found to have been *reckless*, oppressive, fraudulent, or *malicious* in the commission of any of these acts upon the decedent."  (Italics added.)

bad faith.  (See *People v. Vineberg*, *supra*, 125 Cal.App.3d at p. 137.)  Thus, "bad faith" would relate more to knowledge than intent.  (See *People v. Hendrix* (2013) 214 Cal.App.4th 216, 242 [discussing knowledge, mistake of fact, and intent]; see also *In re Jennings* (2004) 34 Cal.4th 254, 276-281 [same].)

Section 859 requires "a person has in bad faith wrongfully taken . . . property belonging to . . . a trust . . . ."  By interpreting "bad faith" to relate to the alleged abuser's beliefs or knowledge, we are asking in the "bad faith" element whether the alleged abuser took property from a trust with a belief or knowledge that the action was wrongful.

### 2.    *SUBSTANTIAL EVIDENCE*

In the instant case, the probate court addressed both possible meanings of "bad faith," i.e., knowledge and intent.  The probate court found that in 2008, when Lisa caused the deed to be prepared, took Mother to execute the deed, and accepted the deed, "(a) Lisa should have known, and did subjectively know, that [Mother] lacked the capacity to convey the [house], and (b) Lisa's actions were motivated, not by an honest mistake of fact, but by her desire either to gain an unearned financial advantage, to deprive Tommy of any benefits under the Trust, or both."

The first finding relates to knowledge, while the second finding relates to intent.  Since we have determined the "bad faith" element relates to knowledge, we will examine whether there is substantial evidence reflecting Lisa had knowledge or could only reasonably believe that Mother lacked capacity to convey the house, i.e., Lisa knew or could only reasonably believe her act was wrongful.

14

"'Under the substantial evidence standard of review, "we must consider all of the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference, and resolving conflicts in support of the [findings]. [Citations.] [¶] It is not our task to weigh conflicts and disputes in the evidence; that is the province of the trier of fact. Our authority begins and ends with a determination as to whether, on the entire record, there is any substantial evidence, contradicted or uncontradicted, in support of the judgment."' [Citation.]" (*In re Estate of Kampen* (2011) 201 Cal.App.4th 971, 992.)

Mother conveyed the house from the trust to Lisa on September 30, 2008. Later that same day, Mother's mental capacity was evaluated. Mother scored a seven on the Folstein mini-mental examination, indicating "very advanced" and severe incapacity. Assuming Mother had a higher capacity level in the mornings than the afternoons, her level of capacity at the time she conveyed the house from the trust to Lisa would most likely only have been a 10 on the Folstein scale, which would still indicate "severe impairment."

A second capacity test was administered on September 30th—the HCAT test. The HCAT test confirmed that Mother "was severely incapacitated." The doctor found Mother suffered major impairments as to time, place, attention, concentration, verbal communication, short-term memory.

Zingg spoke to Mother on three different days during September 2008. At no point was Mother lucid during their meetings. On September 17, approximately two weeks before Mother signed the deed, during a meeting with Zingg, Mother could not

15

say what room she was in, could not identify a pen, could not recall the date, could not recall who the president was, and could not recall her date of birth. Zingg told Lisa that Mother should not sign any legal documents until a formal capacity assessment was conducted.

When Mother was in the hospital in early September, following Tommy's arrest, Mother did not recognize Lisa, and mistook Lisa for her sister. On September 17, when Mother went to the law firm's office to sign the restraining order documents, Mother failed to sign her last name. Mother explained to Lisa that "she [(Mother)] couldn't write."

In late September 2008, Mother, Lisa, and Lisa's daughter, Christina, went to a restaurant together. While at the restaurant, Mother "just out of the blue" asked if Christina recalled Mother taking Christina to medical appointments when Christina was younger, around 1990. Christina began crying because "she couldn't believe that [Mother] had remembered."

The foregoing evidence reflects Mother was severely impaired in multiple ways, such as communication, memory, concentration, and attention. Mother's impairments affected her ability to recognize ordinary objects, such as pens, and from recognizing her daughter. Lisa would have known of these impairments because it was highly improbable that Mother was only severely impaired during medical appointments. Moreover, Lisa was present when her daughter cried because Mother had an accurate recollection of a prior event. This evidence reflects Lisa had knowledge of Mother's lack of capacity.

16

Lisa asserts she is not disputing that Mother lacked capacity, but only that there is not substantial evidence of bad faith. This argument is essentially asserting that Mother's lack of capacity was mild enough that Lisa would not have been aware of Mother's impairments. There is substantial evidence reflecting Lisa must have been aware of Mother's impairments due to their severity and Lisa's interactions with Mother, as detailed *ante*.

Lisa contends there was contradictory evidence reflecting Mother was sometimes lucid. For example, the paralegal found Mother had no difficulty understanding questions and responding. As explained *ante*, the trier of fact resolves conflicts in the evidence—not the appellate court. There is evidence supporting the finding that Lisa knew Mother lacked the capacity to convey the house to Lisa. Our authority ends at that conclusion, we cannot reweigh the evidence. (*In re Estate of Kampen*, *supra*, 201 Cal.App.4th at p. 992.) In sum, substantial evidence supports the probate court's finding of bad faith.

B.    UNCLEAN HANDS

Lisa contends Tommy's petition should have been barred by the doctrine of unclean hands because Tommy abused Mother.

Whether the unclean hands doctrine can be applied in a particular case is a question of law, which we review de novo. (*Brown v. Grimes* (2011) 192 Cal.App.4th 265, 274-275.) "'The [unclean hands] doctrine demands that a plaintiff act fairly in the matter for which he seeks a remedy. He must come into court with clean hands, and keep them clean, or he will be denied relief, regardless of the merits of his claim.'

17

[Citation.]" (*Id.* at p. 282.)  "To deny relief to a party under the unclean hands doctrine, the improper conduct must be 'in the particular transaction or connected with the subject matter of the litigation that is a defense.' [Citations.] 'If he [the wrongdoer] is not guilty of inequitable conduct toward the defendant in that transaction, his hands are "as clean as the court can require."' [Citations.]" (*Id.* at pp. 282-283.)

The probate court concluded Tommy was only entitled to relief in his role as successor trustee.  As a result of that finding, the petition was limited to being brought on behalf of the trust, so that the trust could recover its property.  Tommy's crime against Mother was not relevant to this particular case because this case is about the trust regaining property that was wrongfully taken.  This case is not about Tommy and whether he should be treated as predeceasing Mother in his role as beneficiary.  (§ 259.)  Since the case is about property taken from the trust (and not about whether Tommy should benefit from the trust), Tommy's abusive actions toward Mother are not relevant.

Moreover, the trust has been found to be valid and binding.  If the validity of the trust were being questioned, then any abusive actions by Tommy in 2006 could be relevant, but this case is not about the validity of the trust.  Therefore, the probate court correctly concluded the doctrine of unclean hands does not apply in this case because Tommy's improper conduct is not connected to the subject matter of the litigation; the subject matter is whether the house is trust property and whether Lisa owes damages for having the house removed from the trust.

Lisa contends the unclean hands doctrine is relevant because ordering the house to be returned to the trust is the equivalent of giving the house to Tommy since Tommy

18

is a 95-percent beneficiary under the trust. We disagree. This case is about determining what property the trust owns and whether damages are owed. This case is not about distributing trust assets or whether Tommy is a proper beneficiary. Therefore, ordering that the house be returned to the trust does not equate with a finding related to distribution. For example, this case does not involve a finding that section 259 is inapplicable and therefore Tommy can receive the house. As explained *ante*, section 259 requires a person who has financially or physically abused an elder in bad faith and with a wrongful intent to be treated as having predeceased the elder. Accordingly, we are not persuaded that ordering the house to be returned to the trust is the equivalent of giving the house to Tommy.

C.    CROSS-APPEAL

1.    *PROCEDURAL HISTORY*

At the probate court, Tommy moved for $70,569.64 in sanctions against Lisa, her attorney, and her attorney's law firm. Tommy argued Lisa was opposing Tommy's petition for the purposes of harassing Tommy, delaying the case, and increasing Tommy's expenses. Tommy asserted the evidence of Mother's incapacity was so "overwhelming" that it was frivolous to argue Lisa was unaware of Mother's impairments.

Lisa opposed the motion. Lisa asserted there was conflicting evidence on the issue of Mother's competence, so Lisa's argument was not frivolous, as there was evidentiary support for her position. Additionally, Lisa contended her unclean hands defense had merit.

19

The probate court denied the motion. The court found Lisa's unclean hands argument was not frivolous because "[t]here is no doubt that Tommy had behaved wrongfully," and it had been unclear in what capacity Tommy petitioned the probate court.

2. *ANALYSIS*

Tommy contends the probate court erred by denying his motion for sanctions. (Code Civ. Proc., § 128.7.) Tommy asserts the unclean hands defense was frivolous because there was no basis for applying the defense in this case. Tommy contends Lisa's argument that she did not act in bad faith or that Mother did not lack capacity was frivolous because (1) Lisa did not present medical evidence, and (2) there was overwhelming evidence that Mother lacked capacity.

A court may impose sanctions where a party's opposition was filed for an improper purpose or was indisputably without merit, either legally or factually. (*Peake v. Underwood* (2014) 227 Cal.App.4th 428, 440.) "A claim is factually frivolous if it is 'not well grounded in fact' and it is legally frivolous if it is 'not warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law.' [Citation.] In either case, to obtain sanctions, the moving party must show the party's conduct in asserting the claim was objectively unreasonable. [Citation.] A claim is objectively unreasonable if 'any reasonable attorney would agree that [it] is totally and completely without merit.' [Citations.]" (*Ibid.*) We apply the abuse of discretion standard of review. (*Id.* at p. 441.)

We address the unclean hands portion of Tommy's contention. As explained *ante*, the front page of Tommy's petition reads, "Petitioner Tommy Stephen Luna hereby presents his Petition for Declaratory Relief." The petition further reflects, "PETITIONER, as an interested person and as a successor Trustee of the Trust, requests the Court to make an order that the successor trustee of the Trust has a claim to the [house] that is currently titled in the name of LISA GARZA." The petition also reflects, "Petitioner believes that he has the necessary standing as a successor Trustee and an interested person to file this Petition." In the petition, Tommy identified himself as a beneficiary, heir, son, interested person, and successor trustee.

As a result of the foregoing allegations, it is unclear from the face of the petition in what capacity Tommy petitioned the probate court. Therefore, when Tommy, in his prayer for relief, requested an order declaring the house "is vested [in] Tommy Stephen Luna, Successor Trustee of the Beatrice Ruiz Luna Living Trust," it was somewhat unclear whether Tommy was asserting the house would be declared his personal property or the trust's property. The pleading was vague due to the various contradictions.

Since the pleading was vague, Lisa could reasonably raise the unclean hands argument. Lisa could have reasonably read the petition as Tommy attempting to bypass section 259, and have the house placed directly in his name. Since Tommy proceeded in equity, Lisa raised the equitable unclean hands doctrine to stop Tommy from obtaining the house, to the extent Tommy was suing in a personal capacity. A

21

reasonable attorney could understand this action on Lisa's part, and therefore, we conclude Lisa's reliance on the unclean hands doctrine was not frivolous.[4]

Next, we address the evidence related to Mother's capacity. As the probate court found, there was conflicting evidence related to Mother's capacity, but Tommy's evidence "was more objective, more qualified, and more credible." The relative strength of Tommy's evidence does not equate with Lisa's argument being frivolous. As the probate court found, there was evidence to support Lisa's position, but Tommy's evidence was stronger, therefore, there was an evidentiary basis for Lisa's viewpoint.

Further, Tommy was seeking double damages against Lisa due to Lisa acting in bad faith (§ 859). As a result of that double damages allegation, it was reasonable for Lisa to argue the severity of Mother's dementia. Lisa tried to create a picture of Mother being more capable in the mornings than she was in the afternoons. A reasonable attorney having evidence to support the position and trying to save his client from paying double damages would likely have raised a similar argument, since it appeared that Mother's medical and social worker appointments were in the afternoon. Accordingly, we conclude Lisa's opposition to the petition was not frivolous.

In sum, we conclude the probate court did not abuse its discretion by denying Tommy's motion for sanctions. Tommy also contends the probate court gave erroneous procedural reasons for denying his sanctions motion. Since we have concluded the

---

[4] As discussed *ante*, it was the probate court's act, in its statement of decision, of limiting Tommy to petitioning in his capacity as trustee that ultimately caused the unclean hands to be inapplicable.

probate court did not err by denying the motion on its merits, we do not address the allegedly erroneous procedural reasoning.

## DISPOSITION

The judgment is affirmed on the appeal and cross-appeal.  The parties are to bear their own costs on the appeal and cross-appeal.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MILLER_____

J.

We concur:

RICHLI_____

Acting P. J.

KING_____

J.