Filed 1/25/16  Nations Title Co. v. Security Union Title Ins. co. CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| NATIONS TITLE COMPANY OF CALIFORNIA, | B250490, B253840 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BC426001) |
| v. | |
| SECURITY UNION TITLE INSURANCE COMPANY et al., | |
| Defendants and Appellants. | |

APPEAL from a judgment and orders of the Superior Court of Los Angeles County, Ralph W. Dau, Judge.  Affirmed in part, reversed in part, and remanded with directions.

Blecher Collins Pepperman & Joye, Maxwell M. Blecher, Howard K. Alperin, and Theo G. Arbucci for Plaintiff and Appellant.

Hennelly & Grossfeld, Michael G. King and Susan J. Williams for Defendants and Appellants.

_____

## INTRODUCTION

Plaintiff Nations Title Company of California (Nations) appeals from a judgment entered upon a jury verdict in favor of defendants Security Union Title Insurance Company, doing business as Pacific Coast Title Company (Pacific), Michael Lowther, Wayne Diaz, Tony Becker, and Phil Jauregui (collectively, Defendants) on claims for breach of fiduciary duty and intentional interference with prospective economic relations. Nations and Pacific are competitors in the title insurance industry. Lowther and Diaz are executives at Pacific; Becker and Jauregui are former employees of Nations, who were hired by Pacific after resigning from Nations. At trial, Nations claimed Becker and Jauregui used Nations' confidential information to steal customers from Nations in violation of their fiduciary duties, while all Defendants worked together to interfere with Nations' economic relationships with its customers. Because substantial evidence supports the jury's implicit finding that Defendants' conduct was not a substantial factor in causing Nations' claimed harm, we affirm the judgment.

Defendants also appeal from orders denying their motions for expert witness fees pursuant to Code of Civil Procedure[1] section 998, attorney fees pursuant to Civil Code section 1717, and attorney fees pursuant to the California Uniform Trade Secret Act, Civil Code section 3426.4. We conclude the trial court abused its discretion by failing to assess whether the expert witness fees incurred by Defendants were reasonably necessary to prepare for trial. Accordingly, we reverse the section 998 order and remand the matter to the trial court to conduct the prescribed analysis. The attorney fee orders are affirmed.

---

[1] All further statutory references are to the Code of Civil Procedure unless otherwise specified.

# FACTS AND PROCEDURAL BACKGROUND[2]

1.      *The Parties and Nations' Lawsuit*

Nations is a title company that provides escrow services and issues title insurance policies for real estate transactions in California. Pacific also is a title company issuing title insurance policies in California. Tony Becker is a former title officer for Nations; he resigned from Nations in June 2009 and accepted employment with Pacific. Phil Jauregui is a former Nations sales manager; he also resigned from Nations in June 2009 and accepted employment with Pacific. Michael Lowther and Wayne Diaz were executives at Pacific when the events giving rise to this action occurred.

In November 2009, Nations filed a seven count complaint against Pacific, Becker, Jauregui, Lowther and Diaz asserting causes of action for intentional interference with prospective economic relations, violation of the California Uniform Trade Secret Act, conversion, unfair competition (common law and statutory), breach of fiduciary duty, and conspiracy. Nations' operative third amended complaint added a cause of action for breach of written contract.

Beginning on April 29, 2013, the case was tried to a jury on Nations' claims for breach of written contract, breach of fiduciary duty, and intentional interference with prospective economic relations. On May 20, 2013, the jury returned a verdict in Defendants' favor. The following facts are taken from the evidence admitted at trial.

---

[2]      In this section we set forth the facts and procedural history relevant to Nations' appeal from the judgment. In accordance with the applicable standard of review for an appeal from a judgment entered upon a jury verdict, we state the facts and admitted evidence in the light most favorable to the verdict, resolving all conflicts and indulging all reasonable inferences to support the judgment. (*Green Wood Industrial Co. v. Forceman Internat. Development Group, Inc.* (2007) 156 Cal.App.4th 766, 770, fn. 2.) We state the facts and procedural history relevant to Defendants' appeal in the Discussion section that follows.

2. *The Title Industry*

The customers who refer business to title companies are not individual home buyers or sellers but lending institutions, real estate agents and escrow companies that repeatedly participate in real estate transactions. Typically, in a sale transaction, the buyer's real estate agent chooses the title company, while in a refinance transaction, the lender makes the decision or instructs the escrow company to choose a title company.

When a customer places an order for a title policy, it is referred to as an "open order." It is permissible for a customer to place multiple open orders for the same real estate transaction with multiple title companies. Once an order opens, the title company searches the property's title and generates a preliminary title report. Only when an order "closes" are title documents recorded and money, including the title company's fees, paid out of escrow. Trial witnesses estimated that between 25 to 50 percent of open orders close.

If a title officer leaves a title company where an order is open and reopens that order at a new title company, the original order remains open at the former company during the pending real estate transaction. Nations, like other title companies, stores open order information in an electronic database and maintains this information even when an order has been opened at another title company for the same transaction. An order that has been reopened at a different title company can still close at the original company if the customer chooses.

According to witnesses, customers are generally loyal to the sales representative or title officer who acts as the customer's point of contact with the title company. Because it is the contact person—not the title company—who addresses the customer's concerns and solves the customer's problems, it is not uncommon for customers to follow a sales representative or title officer when he or she moves to a new title company. For this reason, title companies typically attempt to recruit employees who have strong customer relationships that will result in new business for the title company.

4

### 3. *The Becker Team Comes to Nations*

At the time of trial, Becker had worked in the title industry for 25 years and developed relationships with hundreds of customers. Most of those customers have followed him when he changed title companies over the years.

For the past 10 years, his wife Emily Becker has worked with him as a title insurance sales representative, as have his two step-sons, Ronnie and Roemy Castillo. The family has worked together as a team at a number of different title companies, including American Coast Title, Financial Title Company, Nations, and Pacific.

Nannette Lee has been a title sales representative since 2001, and has worked with Becker and his family since 2002. She moved with the Becker family from Financial Title to American Coast Title in 2007, and to Nations in 2008 because her customers like the responsive customer service provided by Becker and his family. Lee's customers also have typically followed her to her new title companies over the years.[3]

In April 2008, Nations hired Jauregui as a sales manager. Shortly thereafter, Jauregui, who had worked with Becker at various companies since 2004, recruited the Becker team away from American Coast Title to work for Nations. Several of the Becker team's customers followed them to Nations.

As part of its recruitment efforts, Nations promised Becker that it would open an office closer to his family's home to ease the family's considerable commute. A year later, as of May 2009, Nations still had not opened the promised office.

### 4. *The Becker Team Moves to Pacific*

In May 2009, Pacific had undertaken to expand its business in Los Angeles by recruiting people who had established relationships with customers. To that end, Pacific's recruiter, Katrina Fowler, had contacted Becker about making a move to Pacific. On May 28, 2009, Fowler sent Becker an offer on Pacific's behalf, requesting that he give notice of his resignation to Nations on June 1 so he could begin work at

---

[3] At times throughout this opinion we refer to the Becker family and Lee collectively as the Becker team or the Becker group.

Pacific on June 2. Fowler subsequently recruited and assembled offers for the rest of the Becker team as well as Jauregui, all of whom came to work for Pacific.

On June 1, 2009, Becker resigned from Nations. Becker testified that he did not take any paper copies of open orders from Nations, and he did not take or destroy any emails or information stored electronically at Nations.

Emily Becker and Ronnie Castillo resigned the next morning, June 2, 2009. That evening, Mrs. Becker sent three emails to Pacific with reports for March, April, and May 2009 showing the number of orders opened by Nations' sale representatives, including the Becker team. The reports did not include customer information, employee salary information, financial information, or information identifying particular orders. Mrs. Becker testified that she transmitted the reports to Pacific to demonstrate that she could bring in business and be an asset to the company. Lowther testified that Pacific did not use the information contained in the reports for any purpose.

Nannette Lee also resigned from Nations the morning of June 2, 2009. The preceding night she had emailed her customers to advise them of her impending resignation. Her email stated, "any new open orders can only send to me [*sic*] from now, and all orders has [*sic*] already been opened with [Nations] I will switch over to the new company." Notwithstanding the email, Lee testified that she did not and could not "switch" a customer's order to a different title company without the customer's approval. Rather, after leaving Nations, she called hundreds of customers to obtain their approval to reopen orders at Pacific. Some customers gave their approval, others chose to keep their orders at Nations.

Jauregui likewise resigned from Nations on June 2, 2009. He did not talk with any of his coworkers about leaving Nations to work for Pacific prior to his resignation.

After the Becker team's departure, Nations still had its electronic database of information related to all open orders, which allowed Nations to contact customers who had relationships with the Becker team in order to close open orders and solicit further business.

5.      *Customers Follow the Becker Team to Pacific*

Four title insurance customers testified at trial, including Anne Cho of Liberty Asset Management and Debbie Johnston of Haven View Escrow. Both Cho and Johnston testified that it is the customer who decides which title company to use, and both testified that they chose to follow the Becker team from one title company to another because they appreciated the service the team provided.[4]

Cho was a manager at Liberty Asset Management from 2007 through January 2011, during which time she used the Becker group to purchase title insurance for the company. Liberty Asset Management buys and sells bank-owned properties after foreclosure and sometimes opens orders in large numbers. On May 28, 2009, Cho emailed Becker with a request to open a group of orders. When they spoke by phone the following day, Becker informed Cho that he was resigning from Nations and asked her what she wanted to do with the orders. Cho instructed Becker not to open the orders at Nations but to do so at his new company. Cho testified that the title company did not matter to her; she was more concerned with the service provided by the individuals handling her orders. She chose to have Becker open the orders at Pacific because she had a longstanding relationship with his team and appreciated the service they provided.

Johnston was an escrow officer at Haven View Escrow in June 2009 and had open orders pending with Nations during that time frame. Johnston did not learn that Becker had left Nations until he called her after he started work at Pacific. On the call, Becker asked Johnston if she would like to reopen her Nations orders at Pacific, but explained to her it would be fine if she kept some of them at Nations. After the call, Johnston contacted her investors to obtain their consent to switch title companies. Even if Becker had not made the request, Johnston testified she would have contacted the investors upon learning of his departure from Nations because she liked the service Becker had provided

---

4       Other customers, Jessica Von of Brighton Lending and Esther Roldan of El Castillo Escrow, likewise testified that they had worked with the Becker team previously and they followed the team to Pacific because the team provided excellent service.

in the past.  Johnston reopened some orders at Pacific with her investors' approval, and kept some orders with Nations for transactions that were close to closing.

6.      *Verdict and Nations' New Trial Motion*

After a nine-day trial, the jury returned a verdict finding Defendants not liable on each of Nations' claims for breach of written contract, breach of fiduciary duty, and intentional interference with prospective economic relations.  The trial court entered judgment on the jury's verdict, and Nations filed a timely notice of intention to move for a new trial.

After taking the matter under submission, the court entered an order denying Nations' new trial motion.  In its written statement of decision, the court reasoned that "[t]he jury could reasonably have found [Nations] failed to carry its burden to show it was harmed by [Defendants' alleged solicitation of Nations' customers] and that customer approval had been obtained for orders moved to Pacific Coast Title."  The court also found that "[Nations'] damages expert . . . was unsound, and the jury could reasonably have rejected his testimony."

Nations filed a timely appeal from the judgment following the denial of its new trial motion.

## DISCUSSION

1.      *Review of an Order Denying a Motion for New Trial and Standard of Review for Nations' Appeal*

Nations maintains its appeal is from the denial of its new trial motion and our standard of review is abuse of discretion.  Nations contends the trial court had a "duty" to grant a new trial if the jury's verdict was contrary to "the weight of the evidence . . . even if there was a conflict in the testimony."  Under this formulation, Nations argues its evidence of Defendants' liability outweighed Defendants' competing evidence, and the trial court therefore abused its discretion by failing to grant a new trial.  Nations is mistaken about the standard of review.

" 'On hearing a motion for new trial the trial judge sits as a thirteenth juror.  He may weigh the evidence, resolve conflicts in it, judge the credibility of the witnesses and reject the testimony of any witness whose testimony he doubts, or accept that of a witness he believes.' " (*Parks v. Dexter* (1950) 100 Cal.App.2d 521, 523 (*Parks*).)  "If the judge is not satisfied with the verdict, and is convinced that it is clearly against the weight of the evidence, it is his duty [on a motion for new trial] to set it aside, even though there may have been some conflict in the testimony." (*Green v. Soule* (1904) 145 Cal. 96, 102 (*Green*).)  " '*An appellate court has no such power*.  Ordinarily we are bound by the decision of the trial judge where the evidence is conflicting and there is reasonably substantial evidence or reasonable inferences to be drawn from the evidence supporting the decision of the trial court.' " (*Parks*, at p. 523, italics added.)  Stated differently, where the evidence "is sufficient to raise a conflict," an appellate court "cannot interfere upon [the] ground" that the trial court could have reached a different conclusion in discharging its duty to weigh the evidence on a motion for new trial.  (*Green*, at p. 102.)

Thus, contrary to Nations' contention, our standard of review is not whether the trial court abused its discretion in denying the new trial motion, but whether *substantial evidence* supports the judgment entered upon the jury's verdict.  Under the substantial evidence standard of review, when the jury's or the trial court's "factual determination is attacked on the ground that there is no substantial evidence to sustain it, the power of an appellate court *begins* and *ends* with the determination as to whether, *on the entire record*, there is substantial evidence, contradicted or uncontradicted, which will support the determination, and when two or more inferences can reasonably be deduced from the facts, a reviewing court is without power to substitute its deductions for those of the trial court.  *If such substantial evidence be found, it is of no consequence that the trial court believing other evidence, or drawing other reasonable inferences, might have reached a contrary conclusion.*" (*Bowers v. Bernards* (1984) 150 Cal.App.3d 870, 873-874 (*Bowers*).)

As a corollary to the rule requiring review of *the entire record,* when " 'appellants challenge the sufficiency of the evidence, *all* material evidence on the point must be set forth and *not merely their own evidence*. [Citation.] Failure to do so amounts to waiver of the alleged error and we may presume that the record contains evidence to sustain every finding of fact. [Citation.]' " (*Toigo v. Town of Ross* (1998) 70 Cal.App.4th 309, 317, italics added (*Toigo*).)

In the instant case, Nations acknowledges that it omitted evidence relevant to the jury's verdict from its opening brief. It nevertheless contends this was permitted under its formulation of the standard of review, because the evidence set forth in its brief "demonstrates that the jury's verdict goes against the great weight of the evidence." As discussed, Nations is incorrect about both the applicable standard of review and its obligation as the appellant to address all material evidence. Be that as it may, though we could treat Nations' failure to follow the rules of substantial evidence as a waiver, we will nevertheless conclude on the merits that substantial evidence supported the jury's verdict.

2. *Substantial Evidence Supported the Jury's Verdict*

Because Nations does not challenge the jury's verdict on its breach of written contract claim, we need only address the evidence supporting the verdict on the breach of fiduciary duty and interference with prospective economic relations claims. (See *Cahill v. San Diego Gas & Electric Co.* (2011) 194 Cal.App.4th 939, 956.)

a. *Breach of fiduciary duty*

We begin with Nations' breach of fiduciary duty claim against Becker and Jauregui. To establish this claim, the court instructed the jury that Nations was required to prove, among other things, that Becker and/or Jauregui used Nations' confidential information for their personal benefit in violation of their fiduciary duties and that their use of such confidential information was a substantial factor in causing Nations' harm. (See *Hasso v. Hapke* (2014) 227 Cal.App.4th 107, 140 [breach of fiduciary duty premised on confidential relationship]; *Stanley v. Richmond* (1995) 35 Cal.App.4th 1070, 1095 [substantial factor causation applies to breach of fiduciary duty claim].) The court

10

further instructed the jury that "[c]onduct is not a substantial factor in causing harm if the same harm would have occurred without that conduct."

Nations argues the following evidence compelled a finding that Becker and Jauregui breached their fiduciary duties: (1) Nannette Lee's email the day before her departure advising her clients that all orders opened with Nations would be "switch[ed] over to the new company"; (2) Becker's telephone conversation with Anne Cho of Liberty Asset Management prior to his departure from Nations asking her whether she wanted to wait to open new orders at Pacific; and (3) Becker's telephone conversation with Debbie Johnston of Haven View Escrow asking her to reopen her Nations orders at Pacific. As we will explain, though this evidence *could* have supported a verdict in Nations' favor, it did not compel one, and other evidence in the record plainly supported the jury's conclusion that Becker and Jauregui should not be held liable for Nations' claimed harm.

Indeed, the trial court identified the most plausible ground for the jury's defense verdict on the breach of fiduciary duty claim. In denying Nations' new trial motion, the court concluded that, notwithstanding the evidence Nations emphasizes on appeal, "[t]he jury could reasonably have found [Nations] failed to carry its burden to show it was harmed by those events and that customer approval had been obtained for orders moved to Pacific Coast Title." We agree with the court's conclusion, and find that substantial evidence supports the jury's implicit determination that Becker's and Jauregui's conduct was not a substantial factor in causing Nations' claimed harm.

First, with respect to Lee's email, though Lee referred to herself as part of Becker's "title unit team," this did not compel a finding that Becker or Jauregui had any responsibility for Lee's conduct. On the contrary, Becker testified that he had no advance knowledge of Lee's email to her customers, and he saw the email only after she sent it. Based on this testimony, the jury could reasonably conclude that Lee, who is not a defendant in this case, acted on her own, without any direction from Becker or Jauregui.

11

Moreover, Lee's own testimony supported an inference that, notwithstanding the statement in her email, it was her customers who directed her to "switch" or reopen their orders at Pacific. Lee testified that she did not and could not unilaterally switch open orders to Pacific because doing so would have been "illegal." The process in most real estate transactions, she explained, requires the customer to name the title company when submitting forms to the bank for loan approval. Thus, with respect to orders that were already opened at Nations, Lee testified she could not just "switch" the title company without the customer's approval, because the title report had to come from the same title company that the customer named in the forms submitted to the bank. Based on this testimony, the jury could reasonably have concluded that it was the customers' decisions, not Becker's or Jauregui's conduct, that caused Lee to reopen the subject orders at Pacific.

The same is true of the Liberty Asset Management orders. Cho testified that Becker did not solicit these orders from her in their telephone conversation; rather, he asked her what she wanted to do with the orders in view of his pending departure from Nations. Cho testified that she instructed Becker to open the orders at Pacific because her company had an established relationship with his team, and what mattered most to her in placing her business was the service that Becker and his team provided, not the title company that employed them. Thus, notwithstanding the fact that Becker was still employed by Nations when this conversation occurred, the jury could reasonably have concluded that it was Cho's desire to have Becker's team handle Liberty Asset Management's business that caused her to place the orders with Pacific rather than Nations, not any wrongful conduct by Becker or Jauregui.

The same causation analysis applies to the orders Johnston asked Becker to reopen for Haven View Escrow. Nations emphasizes two points from Johnston's testimony: (1) Becker called Johnston after he began work at Pacific to ask her to switch some of her Nations orders over to his new company; and (2) following their call, Johnston contacted some of her customers to seek approval for switching their orders to Pacific. As with all the evidence Nations cites on appeal, while this testimony might have supported a verdict

12

in Nations' favor, the jury just as reasonably could have relied on other testimony to find that Becker's conduct was not a substantial factor in causing Johnston to reopen the orders at Pacific. For instance, Johnston testified that *even absent Becker's request* she would have contacted her customers about reopening some of the orders because she appreciated the service Becker provided and wanted the orders to stay with him. She also testified that Becker did not pressure her to reopen the orders, he assured her it would be "okay" if the orders stayed with Nations, and, in fact, she chose not to reopen some of the orders because the transactions were either close to closing or she could not obtain approval from the customer.

In sum, there was competing evidence concerning causation, and it was the jury's task to weigh the credibility and strength of that evidence to determine whether Nations met its burden of establishing that Becker's and/or Jauregui's conduct had been a substantial factor in causing Nations' asserted harm. The verdict shows the jury found that Nations failed to satisfy this burden. As that determination is supported by substantial evidence, we will not disturb it on appeal. (See *Bowers*, *supra*, 150 Cal.App.3d at pp. 873-874.)

> b. *Interference with prospective economic relations*

Nations' interference with prospective economic relations argument suffers from the same weakness. Nations again focuses exclusively on evidence that it contends warranted a liability finding, while patently ignoring other evidence that supported the jury's verdict. This treatment of the record fails to demonstrate reversible error under our substantial evidence standard of review. (See *Toigo*, *supra*, 70 Cal.App.4th at p. 317.)

The trial court instructed the jury that, to establish its claim for interference with prospective economic relations, Nations was required to prove each of the following elements: (1) Nations and certain customers were in an economic relationship that probably would have resulted in an economic benefit to Nations; (2) Defendants knew of the relationship; (3) Defendants intended to disrupt that relationship; (4) Defendants engaged in wrongful conduct; (5) the relationship was disrupted; (6) Nations was harmed;

13

and (7) Defendants' wrongful conduct was a substantial factor in causing Nations' harm. (See *Korea Supply Co. v. Lockheed Martin Corp.* (2003) 29 Cal.4th 1134, 1153.)

Nations contends the evidence discussed above in connection with its breach of fiduciary duty claim also "provides strong, if not conclusive, evidence of intent to interfere with Nations' prospective business relations." Because the relative weight of evidence is irrelevant to our prejudicial error analysis (see *Green*, *supra*, 145 Cal. at p. 102; *Parks*, *supra*, 100 Cal.App.2d at p. 523), Nations' contention about the strength of its evidence is of no moment. As explained above, the evidence Nations relies upon does not conclusively establish Defendants' liability because other evidence admitted at trial supported the jury's implied finding that Defendants' conduct was not a substantial factor in causing Nations' harm.

As for the additional evidence Nations cites in support of its intentional interference with prospective economic relations claim, Nations fails to explain how this evidence bears upon, let alone establishes, the requisite elements of its claim. For example, Nations argues there was evidence that Becker's wife emailed three "Sales Rep Opening Reports" to Pacific and that Pacific "took no steps to return the confidential order reports . . . or [to] discipline Ms. Becker, Becker or any other former Nations employee in any way." Nations says little else about this evidence in its briefs, and it offers no explanation as to why the disclosure of these reports compelled a finding that Defendants interfered with Nations' prospective business relationships or caused damage to Nations.

The same is true of the evidence Nations cites concerning the Beckers' purported deletion of their email accounts. By citing this evidence Nations presumably means to imply the Beckers attempted to conceal some misconduct concerning the contents of their emails. But even if this were true, Nations fails to explain how the deletion of emails interfered with its customer orders or caused it to suffer monetary damages. Nor does it acknowledge or confront the evidence suggesting that customers reopened their orders at Pacific because they simply valued the service Becker's team provided.

14

Finally, Nations argues there was evidence that Jauregui "actively solicited" its sale representatives, and that Pacific, Lowther and Diaz were "directly involved in the en masse recruitment." With respect to Jauregui, Nations admits his recruitment efforts occurred *after* he began his employment with Pacific. The jury, however, was instructed that it could find Jauregui engaged in wrongful conduct only if he solicited the diversion of orders "while at Nations." The evidence cited by Nations does not establish error; it supports the jury's verdict.

Nations' evidence concerning Pacific, Lowther and Diaz is susceptible of a similarly exculpatory inference. Nations contends evidence that Pacific offered the Becker team three-month commission guarantees when they joined the company establishes these Defendants were "directly involved" in Jauregui's supposedly illicit recruitment efforts. However, the commission guarantees are just as reasonably viewed as evidence that Pacific had no intention of interfering with Nations' open orders since, as Defendants explain, the purpose of these guarantees is to compensate new personnel for open orders that are left behind at their previous place of employment.

All told, none of the evidence Nations relies upon compelled a liability finding on either its breach of fiduciary duty or interference with prospective economic relations claim. On the contrary, there was substantial evidence, particularly on the element of causation, that supported the jury's verdict in favor of Defendants.

3. *The Court Abused Its Discretion by Denying Section 998 Expert Witness Fees*

We turn now to Defendants' appeal from the order denying their motion for expert witness fees pursuant to section 998.

a. *Facts and procedural history*

In July 2010, Defendants made a section 998 offer to compromise, offering to pay Nations $75,000 in exchange for Nations dismissing its action with prejudice. Nations did not accept the offer. In March 2013, Becker and Pacific made a second offer to compromise, offering to pay Nations $151,185.64 together with payment of Nations' recoverable costs in exchange for Nations' dismissal. Nations did not accept the offer.

15

After the court entered judgment in favor of Defendants on all claims, Defendants moved for an award of expert witness fees pursuant to section 998. The motion sought $254,267.97 for the fees paid to Defendants' damages expert, Carlyn Irwin, and her firm, Cornerstone Research (Cornerstone).[5] Defendants supported the motion with the declaration of their lead trial counsel, Michael King, who declared he had "substantial involvement with the defense and trial of this case and [was] familiar with the work expert witnesses have performed on behalf of Defendants." According to King's declaration, Defendants retained Irwin as a "non-testifying consultant to analyze lost profits, unjust enrichment, and the facts necessary to defend against Nations' damage claims." The declaration included Defendants' section 2034.210 expert witness designation for Irwin and accompanying declaration of counsel. King stated that he "authorized all work" performed by Irwin and Cornerstone, and that he used their work "[d]uring trial" to "explain[ ] the deficiencies in Nation's [*sic*] damage claims." King declared that Defendants had paid Cornerstone $254,267.97 for the work performed by Irwin and her team, and he attached copies of the paid invoices as an exhibit to his declaration. The invoices included itemized descriptions of the tasks performed by each Cornerstone team member and the time billed by Cornerstone for the tasks.

Nations opposed the motion on three grounds. First, Nations argued Defendants had not made the settlement offers in good faith or with a reasonable belief that they might be accepted because the offers represented only a small fraction of the damages Nations claimed. Second, Nations argued defense counsels' billing records belied Defendants' claim that Cornerstone's services were reasonably necessary to their defense. In that regard, Nations emphasized that counsels' billing records contained only four entries mentioning Cornerstone, totaling just two hours, while the bills showed counsel spent a significant amount of time independently analyzing Nations' damages claims. Finally, Nations argued Cornerstone's fees were excessive, even if some were

---

5    The motion also sought $2,868 for the fees Defendants paid to depose Nations' damages expert. Defendants do not assert any claim of error with respect to the court's denial of these fees.

reasonably necessary to the defense. In support of this contention, Nations offered the declaration of its putative expert on "hourly legal bills for professional services and supporting work product," Gerald Knapton, who opined Cornerstone's invoices supported, at most, an award of $172,951.34. Knapton based the proposed reduction on Cornerstone's billing for duplicative work, block-billed descriptions, vague descriptions, excessive time billed, and rounded off entries that he identified in Cornerstone's invoices.

The trial court denied Defendants' section 998 motion in its entirety; however, the court did so on a ground that Nations had not asserted. With respect to the grounds asserted by Nations in opposition, the court rejected the contention that Defendants' offers had not been made in good faith, reasoning that Defendants' success at trial gave rise to a presumption of reasonableness, and Nations' argument about what damages it believed it could have obtained failed to overcome the presumption.[6] The court likewise rejected Nations' argument that Cornerstone's fees were not reasonably necessary to defend the action. The court found that the limited references to communications with Cornerstone in defense counsels' billing records "[did] not necessarily show that Irwin did not perform the purported tasks or that her services did not aid defendants." The court also found that Nations failed to "produce sufficient evidence to support its argument that defendants' counsel could have prepared, and did prepare, without Irwin's assistance."

Notwithstanding the foregoing, the trial court concluded that Defendants had failed to establish their entitlement to expert witness fees pursuant to section 998. As we discuss in greater detail below, the court's rationale focused on the character of Defendants' evidence—in particular, the fact that Defendants did not offer a declaration from Irwin or her team in support of the motion—*not* whether the fees billed by Cornerstone were reasonable necessary to Defendants' trial preparation. Having found Defendants failed to offer competent evidence in support of the motion, the court

---

[6] Insofar as Nations suggests in its respondent's brief that the trial court found Defendants' offers to compromise were unreasonable, that contention is plainly contradicted by the record.

17

concluded "*Defendants have not shown* that the services for which they seek fees recovery were reasonably necessary."  (Italics added.)

b.    *Applicable law and standard of review*

Section 998 provides for the discretionary award of expert witness fees as follows: "If an offer [of compromise] made by a defendant is not accepted and the plaintiff fails to obtain a more favorable judgment or award . . . the court or arbitrator, in its discretion, may require the plaintiff to pay a reasonable sum to cover costs of the services of expert witnesses, who are not regular employees of any party, *actually incurred and reasonably necessary* in either, or both, preparation for trial or arbitration, or during trial or arbitration, of the case by the defendant."  (§ 998, subd. (c)(1), italics added.)  "The purpose of section 998 is to encourage the settlement of litigation without trial."  (*Adams v. Ford Motor Co.* (2011) 199 Cal.App.4th 1475, 1483 (*Adams*).)

"[T]he decision to award expert witness fees, and the determination of whether these fees were reasonably necessary, are issues left to the discretion of the trial court." (*Adams*, *supra*, 199 Cal.App.4th at p. 1484.)  The trial court, having heard the entire case and observed the expert witnesses' testimony, is in a far better position than an appellate court to exercise this discretion and determine what fees were reasonably necessary. (*Id.* at pp. 1484, 1488.)  Thus, an appellate court ordinarily should reverse the trial court's determination only if it finds "in light of all the evidence viewed most favorably in support of the trial court, no judge could have reasonably reached a similar result." (*Id.* at p. 1484.)  Alternatively, an appellate court also may reverse the denial of statutorily authorized fees where the trial court failed to exercise its discretion to determine whether the requested fees were reasonable.  (See *Garcia v. Santana* (2009) 174 Cal.App.4th 464, 477 (*Garcia*) ["a trial court's failure to exercise discretion is 'itself an abuse of discretion' "].)

c. *The evidence presented was sufficient to establish that some expert witness fees were reasonably necessary to Defendants' trial preparation*

In the instant case, the trial court did not exercise its discretion to determine what expert witness fees were "reasonably necessary" to Defendants' trial preparation because the court concluded that Defendants' proffered evidence was not competent to establish the work that Cornerstone actually performed.[7]  This is evident from the court's statement of decision, which lists the following observations as the sole bases for the court's conclusion:  (1) "Defendants' counsel [King] [did] not establish that he [had] personal knowledge of the work performed by the experts and [did] not identify the work he directed them to perform"; (2) "Defendants [did] not provide a declaration from Irwin or anyone else which describes the work performed"; and (3) "the invoices [submitted under King's declaration] fail to identify the tasks for which fees are sought."  None of these observations is sufficient to sustain a blanket denial of all expert witness fees under the controlling legal and evidentiary standards.

First, as a factual matter, the court's finding concerning King's personal knowledge is contrary to the undisputed evidence.  Personal knowledge simply means "a present recollection of an impression derived from the exercise of the witness' own senses."  (Cal. Law Revisions Com. com., Deering's Ann. Evid. Code (2004 ed.) foll. § 702, p. 375; *People v. Tatum* (2003) 108 Cal.App.4th 288, 297-298.)  King's declaration established both the basis for his knowledge—"[a]s lead trial counsel, I had substantial involvement with the defense and trial of this case and am familiar with the work expert witnesses have performed on behalf of Defendants"—and that he had personal knowledge of the work performed by Irwin and her team—"I authorized all

---

[7]     We focus on the trial court's ruling concerning the "reasonably necessary" prong of the expert witness fee analysis because the evidence is undisputed that Defendants "actually incurred" the fees charged by Cornerstone.  (See § 998, subd. (c)(1) [plaintiff may be required to pay expert witness fees that were "actually incurred and reasonably necessary" to the defense's trial preparation].)

work performed by Ms. Irwin and the employees in her firm."[8]  No evidence was offered by Nations to dispute this testimony, and, in view of King's role as lead trial counsel, there is nothing inherently improbable about the statement that he was familiar with and authorized all work performed by Cornerstone.  There was no sound basis to reject King's declaration for lack of personal knowledge.  (See *Lujan v. Minagar* (2004) 124 Cal.App.4th 1040, 1046 ["A court may not disregard or reject the uncontradicted and undisputed testimony of a witness unless that testimony is inherently improbable or other circumstances such as the witness's demeanor, bias, or motives, create a logical basis for doing so."].)

Second, the premise that Defendants were required to provide a declaration from Irwin or someone at Cornerstone misapprehends the evidence that is sufficient to sustain a defendant's burden on a motion for an award of expert witness fees under section 998. *Jones v. Dumrichob* (1998) 63 Cal.App.4th 1258 (*Jones*) is instructive.  The trial court in *Jones* awarded the prevailing defendant section 998 expert witness fees based upon a verified memorandum of costs, as supported by the defendant's statutory disclosure of expert witnesses, accompanying declaration of counsel, and the experts' invoices. (*Jones*, at pp. 1261, 1265-1266.)  On appeal from the award, the plaintiff argued the defendant "failed to meet his burden of proof that the costs incurred were reasonable because respondent presented no 'competent or admissible' evidence to support the discretionary award of the expert witness fees claimed."  (*Id.* at p. 1266.)  The *Jones* court rejected the contention.  First, the court observed that "nothing in the case law, the statute, or rule 870(a)(1) of the California Rules of Court regarding prejudgment costs . . . prohibits reliance on the declaration of counsel as documentation of the items claimed." (*Jones*, at p. 1265, fn. omitted; see also *id.* at p. 1267 [explaining that prejudgment costs must be claimed in accordance with the procedures set forth in rule 870(a)(1) (now, Rule 3.1700) and "Rule 870(a)(1) does not specify the type of documentation required"].)  As

---

[8]     This testimony also answers the court's charge that King failed to "identify the work he directed [Irwin and her team] to perform."  King's undisputed declaration establishes that he authorized "all work" performed by Cornerstone.

20

for the experts' invoices, the court explained these were admissible for the limited purpose of corroborating the verified memorandum of costs; and, insofar as the charges were paid, the cost memorandum and invoices were evidence that the charges were reasonable.[9] (*Jones,* at p. 1267.) The *Jones* court concluded, "[t]he reasonableness of the expert costs is readily ascertainable from counsel's expert disclosure declaration which places the challenged services in context, as well as from the paid invoices themselves." (*Id.* at p. 1268.) Thus, the *Jones* court held that, in the absence of evidence compelling a different finding, the trial court had properly awarded the defendant his expert witness fees based on the proffered evidence. (*Ibid.*)

We agree with the *Jones* court's analysis, and conclude that King's declaration, as corroborated by the paid Cornerstone invoices, constituted competent evidence that Cornerstone's expert fees were reasonably necessary to Defendants' trial preparation. As in *Jones*, King's declaration placed Cornerstone's work in context. In particular, King explained that a substantial part of Cornerstone's fees were occasioned by the multiple opinions offered by Nations' damages expert, adding that, "[a]t Defendants' request, Carlyn Irwin analyzed and performed work related to all of the expert reports and damages calculations prepared by Nations' damages expert." King's testimony regarding these and the other tasks listed in his declaration were corroborated by Cornerstone's invoices. And, King's undisputed testimony that Defendants paid Cornerstone's invoices was itself evidence that the charges were reasonable. Contrary to the trial court's premise, a declaration from Irwin was not required to substantiate the reasonableness of the charges or to verify that the work had actually been performed. (*Jones*, *supra*, 63 Cal.App.4th at pp. 1267-1268.)

---

9     The *Jones* court explained that the "reason for this rule is a recognition that a person who receives a bill has 'every interest to dispute its accuracy or reasonableness if there is reason to do so. Thus, if a bill or invoice is paid, the court is assured of the accuracy and reasonableness of the charges.' " (*Jones*, *supra*, 63 Cal.App.4th at p. 1268.)

21

Finally, the court's observation that "the invoices fail to identify the tasks for which fees are sought" was not a reasonable basis to deny the requested expert witness fees in their entirety. Defendants' motion sought all of the amounts paid to Cornerstone for all tasks billed in the invoices. The trial court had discretion to deny whatever portion of those fees it determined were not reasonably necessary to Defendants' trial preparation based on the court's experience with the case and observation of the evidence at trial. (See *Adams*, *supra*, 199 Cal.App.4th at p. 1484.) But the court did not have discretion to forego the reasonableness inquiry altogether simply because Defendants requested reimbursement for all fees paid to Cornerstone.[10] Abdication of the court's duty to exercise discretion constitutes an abuse. (See *Garcia*, *supra*, 174 Cal.App.4th at p. 477.)

King's declaration affirmed that he used Cornerstone's work "[d]uring trial" to "explain[ ] the deficiencies in Nation's [*sic*] damage claims." In its order denying Nations' new trial motion, the trial court cited many of the deficiencies King elicited during his cross-examination of Nations' damages expert as a basis for finding "[Nations'] damages expert (Schulze) was unsound."[11] The record compels a finding that at least some of the fees paid to Cornerstone were "reasonably necessary" to Defendants' trial preparation. (§ 998, subd. (c)(1).)

---

[10]    Notably, Nations' putative litigation fee expert opined that the presence of duplicative work, block-billed descriptions, vague descriptions, excessive time billed, and rounded off entries in Cornerstone's invoices supported a reduction of no more than $81,316.63 from the total fees requested by Defendants' motion.

[11]    Those deficiencies, as the court recounted in its order, included the following: Nations' damages expert, Schultze, "did not analyze losses claimed to have resulted from the Becker-Cho telephone call"; "[h]e assumed that Nations' customers in 2009 would have continued with Nations and would have done the same volume of business but for the actions of defendants"; and "[h]e counted customers who went out of business, such as WAMU, as a loss attributable to defendants, and did the same for customers who remained with Nations but did less business." King brought each of these deficiencies to light during his cross-examination of Schulze, and, according to his declaration, King used the work performed by Cornerstone to explain these deficiencies at trial.

Because the trial court is in the best position to judge which tasks performed by Cornerstone meet the reasonably necessary standard, we will reverse the order denying section 998 expert witness fees and remand the matter to the trial court to make this determination. (See, e.g., *Skistimas v. Old World Owners Assn.* (2005) 127 Cal.App.4th 948, 953 [where trial court denied section 998 expert witness fees on erroneous legal ground, remand was necessary to compel the court to determine what amount of fees was reasonable].)

4. *The Court Properly Denied Defendants' Request for Contractual Attorney Fees Pursuant to Civil Code Section 1717; The Employee Manual Permits an Award of Attorney Fees Only as Determined by an Arbitrator*

Defendants contend the trial court erred by denying their motion for contractual attorney fees pursuant to Civil Code section 1717.

a. *Facts and procedural history*

Nations' operative third amended complaint alleged that Nations' Employee Manual constituted a written contract binding Becker and Jauregui "not to use or disclose company secrets or confidential information" and that Becker and Jauregui breached the Employee Manual by "disclosing relevant confidential information to a third party." Nations tried the claim to the jury, which returned a verdict finding Becker and Jauregui were not liable because the Employee Manual did not constitute a contract.

Following entry of judgment, Defendants moved for Civil Code section 1717 attorney fees based on an attorney fee provision in the Employee Manual. The relevant clause of the Employee Manual provides, under the heading "Arbitration; Choice of Law," as follows: "Any controversy or claim arising out of or relating to the employment relationship created between the employer (Company) and employee (you), including all topics covered in this Employee Manual, and the interpretation of this Manual, or any alleged breach of it, shall be settled by arbitration in accordance with the Arbitration Rules of the American Arbitration Association, with such arbitration to take place in the County of Los Angeles, State of California with an agreed upon arbitrator. . . . Although the parties shall initially bear the cost of arbitration equally, the prevailing party, if any as

23

determined by the arbitrator at the request of the parties which is hereby deemed made, shall be entitled to reimbursement for its share of costs and reasonable attorneys' fees, as well as interest at the statutory rate."

In its order denying Defendants' Civil Code section 1717 attorney fee motion, the trial court observed that "the provision states, in no uncertain terms, that fees may be recovered by the 'prevailing party, if any *as determined by the arbitrator . . . .*' " Based on this unequivocal language, the court reasoned that "[t]he 'prevailing party' is thus defined in terms of arbitration," the provision "does not state that fees may be recovered by a prevailing party as determined by the Court," and, therefore, "the subject provision does not 'specifically provide' that attorney's fees incurred outside of an arbitration may be recovered or that they may be recovered by any party other than the party determined to be the prevailing party by an arbitrator." Because "[t]he plain language of the provision shows that the parties' mutual intention was to allow the recovery of attorney's fees only in the context of arbitration," the court concluded Defendants could not recover fees incurred outside of arbitration under the subject provision.

b. *Applicable law and standard of review*

Civil Code section 1717 authorizes the award of attorney fees to a prevailing party "[i]n any action on a contract, where the contract specifically provides that attorney's fees and costs, which are incurred to enforce that contract, shall be awarded either to one of the parties or to the prevailing party." (Civ. Code, § 1717, subd. (a).) As with any contract, "an agreement for the payment of attorney fees must be interpreted in accordance with its terms." (*Kalai v. Gray* (2003) 109 Cal.App.4th 768, 771 (*Kalai*).)

Because our resolution of this issue turns on the interpretation of a contract without the aid of extrinsic evidence, we review the ruling de novo. (*Kalai, supra,* 109 Cal.App.4th at p. 777.)

c. *Defendants were not entitled to attorney fees under the provision of the Employee Manual*

We agree with the trial court's interpretation of the attorney fee provision and adopt the court's analysis as our own.

24

Defendants contend the court's interpretation erroneously focuses on the arbitration language "in isolation" without reading the attorney fee provision "in context." In Defendants' view, reading the provision in context compels the interpretation that "the prevailing party [is] entitled to reimbursement of attorneys' fees upon resolution of any dispute 'arising out of or relating to the employment relationship,' " regardless of "the mechanism used for that resolution." We disagree. Contrary to Defendants' assertion, the context of the attorney fee clause is an *arbitration provision* requiring "[a]ny controversy or claim arising out of or relating to the employment relationship . . . *[to] be settled by arbitration*." (Italics added.) The provision allows for reimbursement of "the cost of *arbitration*" as well as "reasonable attorneys' fees" for the prevailing party "as determined by the *arbitrator*." (Italics added.) Reading the attorney fee clause out of the arbitration context in which the parties placed it fails to give effect to both the language referring to arbitration and the provision's plain objective—to compel the parties to arbitrate their disputes. Adopting Defendants' interpretation would thus contravene a fundamental tenet of our contract construction jurisprudence. (*National City Police Officers' Assn. v. City of National City* (2001) 87 Cal.App.4th 1274, 1279 [" ' "If possible, the court should give effect to every provision. [Citations.] An interpretation which renders part of the [contract] to be surplusage should be avoided. [Citations.]" ' "].)

Apart from their context argument, Defendants contend the court erroneously ignored certain extrinsic evidence that, if considered, would have compelled the court to adopt their proffered interpretation of the subject provision. Defendants begin with the principle that in interpreting a provision subject to multiple reasonable constructions "the court may . . . call to its aid the events subsequent to the execution of the contract, particularly the practical construction given to the contract by the parties themselves, as shedding light upon the question of their mutual intention at the time of contracting." (*Lemm v. Stillwater Land & Cattle Co.* (1933) 217 Cal. 474, 481 (*Lemm*).) From this principle, Defendants argue the trial court erred by refusing to consider the fact that Nations asserted a claim for attorney fees in its complaint based on the same arbitration

25

provision Defendants invoked in their attorney fee motion. As a related point, Defendants also contend the court should have interpreted the provision against Nations as the author of the Employee Manual, citing Civil Code section 1654's directive that "[i]n cases of uncertainty . . . , the language of a contract should be interpreted most strongly against the party who caused the uncertainty to exist." Neither contention has merit.

The problem with both contentions is that the subject contract language is not reasonably susceptible of Defendants' proffered interpretation. As our Supreme Court recognized in *Lemm*, a court may look to the parties' post-execution construction of a contract to aid in ascertaining the parties' mutual intention at the time of execution, but it is only when "it may be determined as a matter of law that the actual mutual intention of the parties may be found *within the scope of the language employed by them*" that a contract will be given a particular construction. (*Lemm*, *supra*, 217 Cal. at p. 481, italics added.) Here, Defendants' proffered construction—that the prevailing party as determined *by the court* should be entitled to attorney fees—is not within the scope of the language employed by the parties—that attorney fees shall be awarded to "the prevailing party, if any as determined *by the arbitrator*." (Italics added.) Nations' post-execution conduct cannot alter the contract's plain and unequivocal language.

This unequivocal language also undermines Defendants' reliance on Civil Code section 1654. That rule of construction can be invoked only "[i]n cases of uncertainty." (Civ. Code, § 1654.) Here, the language is certain—only the prevailing party "as determined by the arbitrator" is entitled to attorney fees. Nothing elsewhere in the subject provision or anywhere else in the contract suggests a prevailing party as determined by the court will also be entitled to attorney fees. There is no ambiguity to resolve against Nations as the author of the Employee Manual. Civil Code section 1654 is inapposite.

The trial court interpreted the attorney fee clause consistent with the only reasonable construction of the language employed by the parties. We find no error in the court's denial of Defendants' motion for contractual attorney fees.

26

5.     *The Court Properly Denied Defendants' Motion for Attorney Fees Pursuant to the California Uniform Trade Secret Act*

Last we address Defendants' appeal from the order denying their motion for attorney fees pursuant to the California Uniform Trade Secret Act (CUTSA).

a.     *Facts and procedural history*

Nations' original complaint asserted a claim for violation of CUTSA based principally on Defendants' alleged misappropriation of Nations' customer information. Defendants moved for summary adjudication of the claim, arguing the identified customer information did not constitute a protectable trade secret and Nations had no evidence to substantiate its charges of misappropriation.

The trial court granted summary adjudication. With respect to the alleged misappropriation of customer information, the court found that certain admissions made by Nations' person most knowledgeable, Dipak Lakhani, at his deposition were sufficient to sustain Defendants' initial burden of showing the trade secret claim lacked merit. Specifically, the court cited Lakhani's admission that a publicly available database, known as "Property Insight," showed open title orders by specific clients for specific properties, including the orders Nations opened in the month preceding the Becker group's departure. This admission, the court reasoned, undermined Nations' claim that the information constituted a confidential trade secret. In opposition to the motion, Nations offered a declaration by Lakhani explaining that Property Insight did not show order histories for Nations' customers or the revenues generated by particular customers or transactions, all of which Nations claimed constituted protectable trade secrets. In granting summary adjudication, the court found Lakhani's declaration insufficient to raise a triable issue of fact, because Nations failed to offer additional evidence showing that Defendants used the non-public information discussed in Lakhani's declaration to solicit business from Nations' customers.

Following entry of the summary adjudication order, Defendants moved for attorney fees pursuant to CUTSA. Defendants argued the summary adjudication proceedings established that Nations' trade secret claim was objectively specious, as

there was no evidence to support the charge of misappropriation, and that Nations continued to prosecute the claim in subjective bad faith, insofar as Lakhani conceded the claim's fatal shortcomings during his deposition.

In opposition to the fee motion, Nations responded that it brought the CUTSA claim based on a good faith belief that Defendants had transmitted confidential customer information to Pacific, but Nations' efforts to prove the claim were thwarted because Defendants deleted evidence from their email accounts that Nations believed would have bolstered the misappropriation charge. In support of the explanation, Lakhani offered a declaration recounting his discovery that Becker's inbox for his Nations email account had been completely deleted just before Becker's departure. Nations' attorney also offered a declaration with deposition excerpts from several defense witnesses who testified that they intentionally deleted their email accounts after each contracted a computer virus.

The trial court denied the attorney fee motion, concluding "the evidence [was] not sufficient to show that [Nations] acted with subjective bad faith." The court credited Nations' assertion that it had a good faith belief that "there was more evidence of defendants' conduct, but that this evidence had been destroyed with defendants' computer files." And the court found that Nations genuinely believed Defendants "engaged in wrongful conduct" by misappropriating trade secrets protected by its Employee Manual and confidentiality agreement.

b.    *Applicable law and standard of review*

The trial court has discretion to award attorney fees under CUTSA as follows: "If a claim of misappropriation is made in bad faith, a motion to terminate an injunction is made or resisted in bad faith, or willful and malicious misappropriation exists, the court may award reasonable attorney's fees and costs to the prevailing party." (Civ. Code, § 3426.4.) "Bad faith" for purposes of Civil Code section 3426.4 requires "objective speciousness of the plaintiff's claim . . . and [the plaintiff's] subjective bad faith in bringing or maintaining the claim." (*Gemini Aluminum Corp. v. California Custom Shapes, Inc.* (2002) 95 Cal.App.4th 1249, 1262 (*Gemini*).)

28

In denying Defendants' motion, the trial court focused on the subjective bad faith prong of the attorney fee analysis. Subjective bad faith under CUTSA " 'means simply that the action or tactic is being pursued for an improper motive.' " (*Gemini*, *supra*, 95 Cal.App.4th at p. 1263.) This includes acting with " 'the intention of causing unnecessary delay, or for the sole purpose of harassing the opposing side.' " (*Ibid.*) Determining whether a plaintiff maintained a CUTSA claim in bad faith " 'involves a factual inquiry into the plaintiff's subjective state of mind [citations]: Did he or she believe the action was valid? What was his or her intent or purpose in pursuing it?' " (*Ibid.*) Because a subjective state of mind will rarely be susceptible of direct proof, the trial court is ordinarily required to infer it from circumstantial evidence. (*Ibid.*) "The timing of the action may raise an inference of bad faith. [Citation.] Similar inferences may be made where the plaintiff proceeds to trial after the action's fatal shortcomings are revealed by opposing counsel." (*FLIR Systems, Inc. v. Parrish* (2009) 174 Cal.App.4th 1270, 1278 (*FLIR Systems*).)

"An award of attorney fees for bad faith [under CUTSA] constitutes a sanction [citation], and the trial court has broad discretion in ruling on sanctions motions. [Citation.] 'Assuming some evidence exists in support of the factual findings, the trial court's exercise of discretion will not be disturbed unless it exceeds the bounds of reason. [Citation.] [¶] In reviewing the facts which led the trial court to impose [or deny] sanctions, we must accept the version thereof which supports the trial court's determination, and must indulge in the inferences which favor its findings. [Citations.]' " (*Gemini*, *supra*, 95 Cal.App.4th at pp. 1262-1263.)

   c. *Substantial evidence supported the court's finding that Nations did not bring the trade secret misappropriation claim in bad faith*

On appeal, Defendants argue the court's findings were insufficient to overcome circumstantial evidence suggesting Nations acted in bad faith. Citing Lakhani's admission that much of Nations' customer information was in fact publicly available on Property Insight, Defendants contend the evidence was uncontroverted that Nations continued to prosecute its CUTSA claim in bad faith even after the claim's fatal

29

shortcomings were identified at Lakhani's deposition. (See *FLIR Systems*, *supra*, 174 Cal.App.4th at p. 1278.) As for the court's finding that Nations believed in good faith that supporting evidence had been destroyed with the deletion of several defense witnesses' email accounts, Defendants argue such a belief, even if genuinely held, could not have justified Nations' continued pursuit of the CUTSA claim.[12] Defendants maintain Nations' belief regarding destruction of computer files was irrelevant to the bad faith analysis because "summary adjudication was granted based on Nations' failures to offer evidence that its compensation structure or customer information *were* trade secrets—evidence that neither required, nor could have been affected by, anything that might have been contained in any computer file maintained by any of Nations' former employees." We do not agree with Defendants' interpretation of the trial court's summary adjudication order.

As discussed above, in granting summary adjudication the court made two findings concerning the parties' respective burdens and evidence. First, the court determined that Lakhani's deposition testimony was sufficient to satisfy Defendants' initial burden of showing the CUTSA claim lacked merit, because Nations' publicly available customer information did not constitute a protectable trade secret. This shifted the burden to Nations to offer evidence raising a triable issue of fact. (See § 437c, subd. (p)(2).) Second, the court determined that Nations' opposing evidence failed to satisfy this burden. Although Lakhani's declaration identified customer information that was not publicly available on Property Insight, the court concluded this alone was insufficient to create a triable issue, because "Nations produced no evidence . . . that

---

[12]     Defendants argue the court should not have credited Nations' evidence on this point, citing the fact that Nations did not request a jury instruction on spoliation at trial. That fact, insofar as it is relevant to a claim that was dismissed before trial, was for the trial court to consider in weighing the strength and credibility of the evidence; it does not compel the rejection of the court's finding under the applicable standard of review. (See *Gemini*, *supra*, 95 Cal.App.4th at pp. 1262-1263.) Lakhani's declaration, as bolstered by the deposition testimony of several defense witnesses, supported the court's finding that Nations genuinely believed evidence of misappropriation had been "destroyed with defendants' computer files."

defendants used details, such as those mentioned by Lakhani in . . . his declaration, to solicit business from [Nations'] customers."

Critically, the court's conclusion with respect to Nations' evidentiary burden was *not*, as Defendants contend, that Nations failed to establish the existence of protectable trade secrets. Rather, the court concluded that Nations failed to offer evidence showing Defendants misappropriated the confidential customer information described in Lakhani's declaration. To be sure, that conclusion was an appropriate ground for granting Defendants' summary adjudication motion and dismissing Nations' CUTSA claim. However, the conclusion also was consistent with the court's subsequent finding that Nations pursued the CUTSA claim in good faith, genuinely believing it would discover evidence supporting the charge of misappropriation that Nations presumed had been "destroyed with defendants' computer files." While that belief alone was not sufficient to raise a triable issue of fact in opposition to Defendants' summary adjudication motion, it did support the court's reasonable inference that Nations pursued the CUTSA claim in good faith and not simply to cause unnecessary delay or harass Defendants. (See *Gemini*, *supra*, 95 Cal.App.4th at p. 1263; see also *SASCO v. Rosendin Electric, Inc.* (2012) 207 Cal.App.4th 837, 847 ["The absence of evidence alone, even after discovery, does not support a finding of subjective bad faith"].) We find no abuse of discretion.

**DISPOSITION**

The judgment on the jury verdict is affirmed.  The orders denying Defendants' attorney fee motions pursuant to the CUTSA and Civil Code section 1717 are also affirmed.  The order denying Defendants' motion for expert witness fees pursuant to section 998 is reversed and the matter is remanded to the trial court to determine which expert witness fees were reasonably necessary based on the evidence presented and the court's experience with the case.  Defendants Security Union Title Insurance Company doing business as Pacific Coast Title Company, Michael Lowther, Wayne Diaz, Tony Becker, and Phil Jauregui shall recover their costs on appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

EDMON, P. J.

We concur:

ALDRICH, J.

LAVIN, J.